THE STATE v. MIKE AGUELERA and JOE MARTINEZ, Appellants.—33 S. W. (2d) 901.

Division Two, December 31, 1930.

1206

*Alexander J. Filipiak* and *Ira H. Lohman* for appellants.

1208

*Stratton Shartel*, Attorney-General and *Don Purteet*, Assistant Attorney-General, for respondent.

COOLEY, C.—David Velasco and appellants Mike Aguelera and Joe Martinez were jointly indicted in the Circuit Court of the City of St. Louis for the killing of one Nathan Broddon, the indictment charging murder in the first degree. Upon arraignment each pleaded not guilty and thereafter a severance was granted to Velasco.

Aguelera and Martinez were tried jointly and both were found guilty of murder in the first degree, the jury assessing the punishment of each at death. Aguelera was sentenced in accordance with the verdict. The court reduced Martinez's punishment to life imprisonment in the penitentiary and so sentenced him. The two have jointly appealed to this court.

With some modification we adopt the statement of the facts shown by the State's evidence, as epitomized in the State's brief. Deceased, Nathan Broddon, a man sixty-two years old, and his wife conducted a small store at 2317 Cherokee Street in St. Louis. The rear part of the store was partitioned off and the Broddons occupied it as living quarters. The defendants are Mexicans and were living at the home of defendant Martinez in Madison, Illinois, at the time of the homicide.

On October 31, 1928, about 9:30 or ten o'clock in the morning, two men entered deceased's place of business and asked to buy a pair of shoes. When Broddon turned to the shoe rack to get the shoes one of the men hit him on the head with some sort of instrument, but did not knock him unconscious. As he turned around one of the men presented a pistol and told him to "stick them up." Instead, Broddon grabbed the pistol, whereupon he was immediately shot twice in the abdomen. The two men ran out of the store, one of them throwing the pistol at Broddon, who picked it up and gave chase, stopping outside in front of the store. Near-by police officers, hearing the screams of the wounded man and his wife, hurried to the scene and took up the chase. After a short pursuit Velasco was apprehended in the cellar of a bakery. Broddon was rushed to a hospital and placed on an operating table, where he died about twenty or twenty-five minutes after twelve o'clock that day. Before his death police officers brought Velasco to the operating room and he was identified by Broddon as one of the men who shot him during the attempted robbery.

Mrs. Broddon was not in the store when the robbers entered, having gone to another store to telephone. She returned while they were still there, but after her husband had been struck on the head and shot. She testified that when she entered the store her husband was lying or "kind of sitting down like" on the floor struggling with two men who appeared to be trying to get something out of his pockets; that there was blood on his face; that she started screaming and the men fled. She identified Velasco and defendant Aguelera as the two men whom she had thus seen.

Detectives of the St. Louis police force went to Martinez's home in Madison, Illinois, about 8:30 or nine o'clock on the evening of the day of the homicide, where they found defendant Aguelera, Martinez's son Frank, one Pedro Floris and a young woman by the name of Lillian Pellom. All were arrested and taken to the

Madison police station. Defendant Martinez and Velasco were not at the home at the time of that arrest. Aguelera voluntarily stated to detective Wren that he, Martinez and Velasco had planned the robbery of Broddon's store on the night before the homicide. Miss Pellom, who had stayed at the Martinez home for several days preceding the homicide, testified that Velasco, Aguelera and Martinez were at the latter's home, talking in Spanish, the night before the homicide; that a pistol was exhibited during their conference and that they left the house together in a Chevrolet car belonging to Martinez early in the morning of the day Broddon was killed. She did not know where they were going. Aguelera, in his statement to Wren, said that he and Velasco, who had the pistol, were the ones who went in Broddon's store and that Velasco shot Broddon. Martinez was arrested about three o'clock in the morning following the homicide. He was taken to the Madison police station where he made a voluntary statement. He admitted being the driver of the car, but denied that he knew there was to be a robbery committed. He said that he remained at the wheel of the car outside of Broddon's store while the other two went inside; that shortly thereafter he heard some shots fired and saw an old man come out on the sidewalk ahead of Velasco and Aguelera; that Aguelera ran west and he, Martinez, drove the car west to Jefferson Avenue when he picked up Aguelera and returned to his home in Madison. Aguelera, while still in the Madison police station, stated that all three men went to Broddon's store for the purpose of robbery, as they had planned the night before at Martinez's home.

Aguelera and Martinez, defendants herein, and Miss Pellom all waived extradition to the State of Missouri, whereupon they were brought to a police station in St. Louis. Aguelera and Martinez were confronted with Velasco. Aguelera again stated voluntarily that the three went to Broddon's store for the purpose of robbery and that he and Velasco had gone inside the store; that Velasco had the pistol "and that he hit Mr. Broddon on the head with it first and started behind a partition with Mr. Broddon, and that he remained inside at the front door, and right after Velasco took Mr. Broddon behind this partition he heard two shots fired and that Velasco came running towards him and the both of them went out of the store; he run west and Velasco run east." The pistol with which deceased was shot was identified as Velasco's.

Defendants called two witnesses from whom testimony was elicited, intended apparently to prove an alibi, but if true it did show that defendants were not at the Broddon store at the time the State's evidence shows the crime was committed.

I. The point chiefly stressed and relied upon by appellants for reversal is the refusal of the trial court to appoint an interpreter

for defendants. They contend that such refusal in effect prevented them from testifying in their own behalf. To a proper understanding of that question a statement of the facts relative thereto is necessary.

The native tongue of both defendants is Spanish. It is not shown how long either had been in this country. Two of the State's witnesses, police officers who participated in the arrests, testified at considerable length to conversations with each defendant separately and to conversations with these two defendants together and with these two and Velasco. In these conversations, which were carried on in English, many questions were asked and answered. Both officers testified that both defendants understood them and were understood by them clearly and without difficulty. According to their testimony not only was there no suggestion from either defendant that he could not understand English, but both said they could understand it though they could not read or write it and both answered all questions "distinctly and intelligently."

Miss Pellom's testimony was to the same effect. She had known both defendants, just how long is not shown, prior to the homicide, and occasionally met and talked with Martinez and had "kept company" with Aguelera for a short time. She testified: "I went with him for a while." She spent several days immediately preceding the day of the homicide in the Martinez home. She spoke and understood only English. She testified further that Velasco, Aguelera and Martinez all understood English and spoke it well enough to be understood; that she had no difficulty in conversing with them in English. She also testified that on the afternoon of October 31, 1928, Martinez, Aguelera, the latter's brother and herself went in Martinez's automobile on some errand of Martinez or Aguelera, and that on the trip Aguelera bought a newspaper printed in English; that after looking at the paper, apparently reading it, he spoke in Spanish to the other two men; that she observed in the paper an item concerning the attempted robbery and the murder of Broddon and asked Aguelera if he "pulled that job," to which he replied that he would tell her when they got home. After their return to Martinez's home he did tell her about it, and that he had shot Broddon, but asked her to say nothing about it as "they" would hang him if they found it out. The purchase of the paper and his apparent reading from it indicates that Aguelera could read English to some extent.

When the State rested its case defendants called two witnesses. The first one, Costello, yard superintendent for the St. Louis Gas & Coke Co., of Granite City, Illinois, testified that Martinez had worked for him two or three times at that plant; that he, witness, spoke only English; that when Martinez worked for him Martinez spoke English, had no trouble in understanding the English lan-

1212

guage and witness could understand him. The second witness, Peters, did not testify on that subject.

Up to this point of the trial defendants had not at any stage of the proceedings asked for an interpreter or made any suggestion to the court that they desired one or that they did not fully understand all that was being said and done. At this point, witness Peters having been excused, the following occurred:

"MR. FILIPIAK (counsel for defendants): We want an interpreter.

"MR. FLYNN (for the State): I object to the use of the interpreter unless Mr. Filipiak makes a showing this man can't speak and understand English.

"THE COURT: That is what the evidence is, that he can speak English and understand it.

"MR. FILIPIAK: There was one witness on the stand and stated that Spanish was mostly spoken in the home. I think that is sufficient.

"THE COURT: That is true, but she also testified that she could understand both of them—that at least she could understand the defendants. So, in that situation, where there is an objection, I will have to sustain the objection.

"MR. FILIPIAK: We can't get along without an interpreter.

"THE COURT: That is the way it will have to be at this time. Proceed.

"MR. FILIPIAK (addressing defendant Joe Martinez): All right, take the stand. Save exception to the ruling of the court."

(Joe Martinez, the defendant, was then put on the stand.)

"THE COURT (addressing the witness): Of course, you understand you are not to answer any question you do not understand, and make sure that you understand the question before you answer it, and then answer the question. Proceed.

"MR. FILIPIAK (addressing the witness): Do you understand what the judge said? A. Yes, a little—I can't understand the law.

"MR. FILIPIAK: You are not supposed to understand the law. If you understand what his Honor said to you, we can proceed, but if you don't I don't see how we can without an interpreter. Do you understand what his Honor said? A. No, I can't understand.

"THE COURT: Oh, yes; you did. I asked you not to answer questions unless you understood them—don't you understand that? A. I can't get it.

"Q. Don't answer any question you don't comprehend, then.

(Witness talks in foreign language.)

"Q. Talk English here. A. I can't speak very much—just a few words necessary for my job.

"THE COURT: I understand the words you use very clearly—go ahead.

"MR. FILIPIAK: Under the circumstances, your Honor, my responsibility is too great to permit him to proceed in the English without having that understanding, and I will remove him from the stand, and we save our exceptions to the court's ruling in regard to the denial of the use of an interpreter, based on the State's objection thereto.

"THE COURT: Call your next witness.

"MR. FILIPIAK: The defendants rest."

The testimony "that Spanish was mostly spoken in the home," referred to by Mr. Filipiak as, in his opinion, a sufficient showing that defendants could not speak and understand English, consisted of one question and answer in the cross-examination of Miss Pellom, as follows: "Q. What language is spoken mostly in the Martinez home, Spanish or English? A. Spanish." In view of the positive and uncontradicted testimony of Miss Pellom herself and of three other witnesses, one of them defendant's witness, that defendants could and did understand English and speak it intelligently, which was before the court and was the only showing that had so far been made on the subject, it is plain that the mere fact that Spanish was mostly spoken in the Martinez home did not call for the appointment of an interpreter. Such fact was not necessarily inconsistent with nor did it disprove the testimony that defendants could and did understand and speak English. They may have spoken their native language better, or may have used it in preference to English or as a measure of privacy, and yet have been able to understand and speak English sufficiently well when they wished to do so. There was no error therefore in the court's ruling sustaining the State's objection to the request for an interpreter when that objection was offered and the ruling thereon was first made.

No further showing of any kind was made or offered as to defendant Aguelera, nor was he offered as a witness. Clearly, therefore, on the record presented he cannot successfully urge prejudicial error in the ruling complained of. As to Martinez the record presents a somewhat different situation. He was offered as a witness and what then transpired has been set out *in haec verba* above.

By statute, Section 2343, Revised Statutes 1919, and of inherent necessity were there no statute, trial courts are authorized to appoint interpreters and translators to interpret testimony when required. Necessarily, the court must in the exercise of sound judicial discretion and judgment, determine in each instance whether or not the appointment of an interpreter is required. "In the very nature of things, the courts are invested with a discretion in appointing interpreters and unless it shall appear that there has been

an abuse of this power, it affords no ground for reversal by this court." [State v. McGinnis, 158 Mo. 105, 119, 59 S. W. 83.]

The trial court saw and heard the witnesses, including defendant Martinez. The latter said but little on the stand and from that little we can scarcely judge his understanding of English, but what he said and the language in which his answers to questions was couched, so far as we can judge from the printed page, indicate, we think, a fair understanding and command of the English language. The trial court, with much better opportunity to form a correct opinion in the matter than we have, was convinced that this defendant, notwithstanding his attempted denial, was able to understand and speak English well enough that an interpreter was not needed to enable him to give his testimony. We cannot say on the record presented that the court erred in that conclusion, nor are we persuaded that defendant was prejudiced by the court's failure to appoint an interpreter for him. We rule this point against appellants.

II. Appellants in their brief complain of the court's failure to instruct on murder in the second degree, and also criticise certain of the instructions given. There was no evidence calling for an instruction on second degree murder. All the evidence tended to show murder committed in an attempt to commit robbery, which is murder in the first degree. [Sec. 3230, R. S. 1919; State v. Nasello (Mo.), 30 S. W. (2d) 132; State v. Messino (Mo.), 30 S. W. (2d) 750.] Moreover, there were no objections made or exceptions taken or saved at the trial or preserved in the motion for new trial to the action of the court in giving or failing to give instructions. The motion for new trial makes no reference to the instructions given nor to the court's alleged failure properly to instruct the jury. There is therefore nothing here for review concerning the instructions. [State v. Hedgpeth, 311 Mo. 452, 278 S. W. 740; State v. Stuart, 316 Mo. 150, 289 S. W. 822; State v. Knight (Mo.), 278 S. W. 1036, 1039, and cases cited.]

III. The complaint in appellants' brief that they were not furnished a list of qualified jurors twenty-four hours before the trial as provided by Section 4021, Revised Statutes 1919, is without merit. That statutory provision is no longer in force (see Laws 1925, p. 197), and moreover, no contention that appellants were not allowed sufficient time in which to make their challenges was made at the time nor were exceptions taken or preserved to such action of the court if it occurred.

IV. It is alleged in appellants' brief that the court erred in admitting in evidence "declarations made by deceased when they

were not proven to be dying declarations." There was no objection made on that ground at the trial and there is no such objection preserved in the motion for new trial, wherefore it is not presented for review. [State v. Miller (Mo.), 207 S. W. 797, 799; State v. Catalino (Mo.), 295 S. W. 568, 570.] It is also claimed that the court erred in admitting "irrelevant, incompetent and hearsay testimony" over the objections of defendants. No attempt is made in the motion for new trial to point out the alleged improper evidence admitted. Such assignment of error in a motion for new trial is not sufficiently definite to merit consideration on appeal. [State v. Williams (Mo.), 292 S. W. 19; State v. Harmon (Mo.), 296 S. W. 397, 399.]

V. The foregoing disposes of all of the points made in appellants' brief. There are some further objections in the motion for new trial which are not briefed and apparently are no longer urged. Some relate to matters concerning which no objections were made nor exceptions saved at the trial; others to alleged facts not shown by the record to have occurred. Of the latter type is alleged prejudicial argument of the prosecuting attorney which is not set out in the bill of exceptions. The statement in the motion for new trial, relative to improper argument, in addition to being too vague and general to present anything for review, does not prove itself. The allegations that the verdict is against the weight of the evidence and that the punishment assessed is so excessive as to indicate prejudice and passion on the part of the jury toward appellants because of their foreign birth are without merit.

We have examined the record and considered the case carefully. There is ample evidence to sustain the verdict and we find no prejudicial error in the record. It results that the judgment of the circuit court must be and it is affirmed. *Davis, C.,* concurs; *Westhues, C.,* not sitting.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All of the judges concur. Date of execution set for Friday, January 30, 1931.