STATE of Missouri, Respondent,

v.

Ruben GONZALEZ-GONGORA, Appellant.

No. 13297.

Missouri Court of Appeals, Southern District, Division One.

June 29, 1984.

Donald R. Duncan, Springfield, for appellant.

John Ashcroft, Atty. Gen., Janet E. Papageorge and John M. Morris, Asst. Attys. Gen., Jefferson City, for respondent.

FLANIGAN, Presiding Judge.

A jury found defendant guilty of robbery in the first degree, § 569.020,[1] and he was sentenced to 12 years' imprisonment. Defendant appeals.

■ Defendant's first point is that the evidence was insufficient to support the verdict. In ruling this point this court must view the evidence in the light most favorable to the state and accept all substantial evidence and all legitimate inferences fairly deducible therefrom which support the verdict. All evidence unfavorable to the state must be disregarded and the submissibility of the case will be determined upon the basis of all the evidence, including those portions of defendant's evidence which favor the state. *State v. Stith,* 660 S.W.2d 419, 420–421[1] (Mo.App. 1983).

On Monday, April 26, 1982, at 1:30 a.m., Christopher Royal, a store clerk employed at a Git'N'Go store located at 2963 East Division in Springfield, was held up at gunpoint and $130 was taken from his cash register by the gunman, a black man whose name is not disclosed in the record and who will be referred to as "R." Defendant was present at the time R committed the robbery and the decisive issue is whether or not the state proved that the defendant was criminally responsible, as an aider, for R's conduct.

"A person is criminally responsible for the conduct of another when ... (2) [e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." § 562.041.1.

■ One who, before or during the commission of a crime, intentionally and knowingly aids or encourages the commission thereof is guilty of that offense. Aiders and abettors, who act with common purpose with active participants in the crime, incur criminal liability by any form of affirmative advancement of the enterprise. The evidence need not show that defendant personally committed every element of the crime. Among other things, indicia of aiding and abetting are presence at the scene of the crime, flight therefrom and association with others involved before, during and after commission of the crime. Proof of any form of participation by defendant in the crime is enough to support a conviction and his presence at the scene, his companionship and conduct before and after the offense, are circumstances from which one's participation in the crime may be inferred.[2]

■ However, the mere presence of the accused at the scene of the crime, coupled with an opportunity on his part to have committed it, will not suffice to support a conviction. *State v. Allen,* 420 S.W.2d 330, 333[3] (Mo.1967). Also insuffi-

---

1. All references to statutes are to RSMo 1978, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

2. Each principle in this paragraph is set forth, with citation of authority, in *State v. Gannaway,* 649 S.W.2d 235, 239[7–11] (Mo.App.1983).

cient is the combination of presence at the scene and flight therefrom. *State v. Castaldi*, 386 S.W.2d 392, 395 (Mo.1965); *State v. Minor*, 531 S.W.2d 101, 102[2] (Mo.App. 1975).

Defendant is a Cuban who, at time of trial, had been in this country approximately three years and was 31 years old. During the course of the robbery, R, in reaching into the cash register drawer, activated a surveillance camera. As a result, 19 photographs, covering a span of 19 seconds, were obtained during the commission of the robbery. Defendant, who was admittedly present, is shown in several of those photographs and so are clerk Royal and R. No other person was present during the happenings at the store.

After the robbery was reported to the police, and the surveillance films were developed, Richard Phillips, a Springfield police officer, recognized R and defendant as being the two men whom he saw at 5:30 p.m. on Sunday, April 25, approximately seven hours prior to the robbery, while the officer was on routine patrol at the intersection of Campbell and Walnut in Springfield. That intersection is several miles from the scene of the robbery. Officer Phillips testified that he had not seen the two men before, that they were standing on the west side of Campbell waiting to cross the street, and that he noticed them because it was odd that "an Indian or Mexican or whatever was with a black man." Phillips testified that R and the defendant were conversing but the witness did not hear what was said.

Store clerk Royal, the state's principal witness, testified that at 1:30 a.m. on April 26 R and the defendant entered the store. As the two men came through the front door they were walking "side by side." The two men walked over behind an ice machine and stopped there, a foot or two apart. They were standing together and Royal could see their heads and shoulders. They were three or four feet from the counter. R had his back to Royal. As Royal came around to "greet the two men" defendant, holding a $20 bill, walked toward the counter and placed his hand on the counter. R still had his back to Royal and Royal "could see R's elbow sticking out like this—at a ninety degree angle." Royal asked defendant if he could help him and defendant said something which Royal did not understand. Defendant spoke again and on the third time Royal figured out that defendant wanted Salem cigarettes. During this time R was still in the same position with his back to Royal.

The cash register had a "pre-set key for cigarettes" and Royal "just punched the key" because defendant "had already displayed the money he was going to pay with." Royal "immediately tendered in $20 and hit the amount tendered." This opened the cash register drawer. Royal said, "You can punch the stuff up on the cash register and get the cigarettes and feed it all in one motion" because the cigarettes were on a shelf close to and behind the cash register. Royal said that by the time the drawer was coming out "I had already got the Salem cigarettes" and dropped them in the middle of the counter. "It's an automatic response." One to three seconds elapsed from "my hitting the key, grabbing the cigarettes and putting them on the counter." "If I had not seen the $20 bill, the cash drawer would have been closed."

Royal said, "When I turned around to put the cigarettes on the counter and make change I observed a weapon sticking in my face—a hand gun." The gun was held by R.

Significantly Royal testified that when he first turned to his left, to get the Salem cigarettes, defendant was standing at the counter. When Royal turned back, one to three seconds later, R was standing at the counter and the defendant had moved back a couple of feet.

Questioned by the prosecutor, Royal gave the following testimony:

Q. Now at the time that you turned to your left, who was standing at the counter?

A. O.K. The defendant.

Q. As you turned to get the cigarettes and turned back, which as I understand your testimony, was one to three seconds—

A. —Uh-huh.

Q. —who was then standing at the counter?

A. The black man.

Q. Now did you have occasion to see where the defendant was at that point in time when you turned back?

A. O.K. The defendant had moved back a couple of feet.

Q. Now after you turned back and saw the black man with the gun pointed at you, what, if anything, did you then do?

A. Well, my first reaction was to stare at the barrel. And when I realized that it was a real gun, I slowly brought my hands up and looked straight ahead.

. . . .

Q. So as I understand your testimony, after you turned and obtained the Salem cigarettes and returned them to the counter,—

A. —Uh-huh.

Q. —the order of persons would have been you, the black man and then the defendant behind the black man?

A. Yeah. Uh-huh.

Royal further testified that R "just grabbed across with his left hand and started taking the bills out of the drawer." That activated the surveillance camera and set off an alarm "which is hooked up with Tulsa and they call our police department."

At no time did R point the gun at defendant. The gun was always pointed at Royal. The surveillance photographs show that while R was threatening Royal with the gun and ransacking the cash drawer, the defendant was walking around and moving his arms with apparent casualness. During the 19 seconds shown by the photographs, the defendant walked over to the front door and opened it, a movement of perhaps 10 feet.

After the photographing ended R told Royal to put the coins, part of the $130

taken, into a sack. A phone was near the cash register and R leaned over the counter, "grabbed the whole assembly, the phone, ripped it off and threw it behind him. During this time the defendant was just walking around, just meandering around." R then instructed Royal to get down on the "ground" and Royal did so. R asked Royal for a couple of packs of Kool regulars and Royal by mistake grabbed a pack of Kool lights and threw them to R. R told Royal he had thrown the wrong kind so Royal found two packs of Kool regulars and gave them to R and he lay back down.

About two minutes elapsed between the time defendant and R entered the store and the time "they left." Royal said that after he gave R the Kool regulars "I laid back on the ground and there was silence. After a few minutes, after I gained my composure, I crawled around and locked the front door. At that time both defendant and R were gone." So were the Salem cigarettes.

Defendant's testimony was that immediately prior to entering the store he had spent several hours at a nearby bar. The state introduced evidence that there were only two bars in the general vicinity and that both of them were closed on Sunday. Defendant denied that he had ever seen R before the occurrences at the store.

■ Defendant and R were together earlier in the evening at a point several miles from the robbery scene. At that time they were conversing. They entered the store together and their joint movements prior to the brandishing of the weapon were orchestrated, or so a jury could find. Defendant's conduct in exhibiting the $20 bill and ordering the Salems, acts admittedly innocent per se, were well timed to produce the effects of the cash register drawer opening and the clerk's momentary distraction from R's movements. While defendant and R were standing together, seconds before, R made movements with his right elbow which would justify an inference that he was withdrawing the gun from a place of concealment on his person. During the ransacking of the cash register drawer defendant moved around freely.

Especially incriminating is the evidence that when R first confronted Royal with the gun defendant was standing a short distance *behind* R. That was a position which R would not likely accord an innocent bystander. It is also unlikely that the defendant would assume that position, by moving away from the counter, before he had picked up the Salems. The photographs, which the jury saw and this court has seen, show that while Royal was standing behind the cash register, with his arms up in response to the weapon leveled at him, defendant, who at no time had his arms in the air, moved around casually and at will with R displaying little or no interest in defendant's movements. R and defendant left the store at approximately the same time. Defendant did not report the matter to the police until May 11 when he went to the police station because he had been told that the police were looking for him.

The foregoing circumstances, in their totality, justified the jury in finding that defendant aided R in the commission of the robbery. This court holds that the evidence was sufficient to support the conviction. Defendant's first point has no merit.

Defendant's second point is that the trial court erred in failing to appoint an interpreter for defendant "for each and every stage of the proceedings" because defendant did not speak English and his lack of an interpreter constituted a denial of his "right to due process" and this right was not waived by his failure to request an interpreter.

3. Defendant's appellate counsel did not represent him at the trial.

4. In *United States v. Berrios,* 441 F.2d 1125 (2d Cir.1971), the same person performed both roles of witness-interpreter and defense-interpreter and the court held that such procedure was not per se improper. On the other hand, in *People v. Carreon,* 151 Cal.App.3d 559, 198 Cal.Rptr. 843 (1984), a decision based at least in part on a provision of the California Constitution granting non-English-speaking criminal defendants a right to an interpreter "throughout the proceedings," the court held that the trial court erred in

■■■ This allegation of error has not been preserved for appellate review because it was, not included in the motion for new trial. Rule 29.11(d). It will be examined only for plain error. Rule 29.12(b). *State v. Harris,* 620 S.W.2d 349, 354[7] (Mo. banc 1981). At no time during the trial did the defendant or any of his three lawyers [3] request the trial court to appoint an interpreter. The record reflects, however, that the trial court was not as insensitive to defendant's rights as the statement of the point would indicate.

■■■■ A witness-interpreter is used to translate, for the benefit of the court and all in attendance, the testimony of a witness who is unable to testify in the language of the forum. A defense-interpreter, on the other hand, serves as a translator for a criminal defendant who, by reason of a physical disability or non-familiarity with the language of the forum, is otherwise inhibited in his ability to comprehend the proceedings and communicate with counsel. Defendant's complaint is that the court did not appoint a defense-interpreter, as distinguished from a witness-interpreter.[4]

On the morning of the trial, and before it commenced, defense counsel stated to the court, "Defendant does not speak English. He speaks Spanish. This is Ricardo Vielmas. He is here to translate for [defendant] so that he might know what is going on." The court granted permission for Vielmas to sit at the counsel table with defendant and his attorneys. The record shows that Vielmas was present throughout the trial and sat at the counsel table until the final arguments began.[5]

permitting the defense-interpreter to perform the additional role of witness-interpreter and that the right to a defense-interpreter was not waived by mere acquiescence or silence.

5. With regard to pre-trial matters, the record reflects that on May 11, 1982, at defendant's arraignment, "Defendant appears with Ricardo Vielmas (interpreter employed by Z-Tech Company) and defendant was arraigned." The preliminary hearing was held on June 16, 1982, and defendant was "bound over" to circuit court. The court's entry on that date does not mention Vielmas. However, on June 18, 1982,

Defendant was the only participant in the trial court proceedings who did not speak English. Before defendant testified in his own defense the trial court, outside the presence of the jury, heard testimony concerning the qualifications of Teresa Van Slyck to act as witness-interpreter for defendant. In finding Mrs. Van Slyck qualified, a finding not challenged by defendant and fully supported by the record, the trial court meticulously followed the suggested guidelines for such a hearing which are set forth in *Kley v. Abell*, 483 S.W.2d 625 (Mo.App.1972). Although defendant's brief is less than specific on the point, his complaint seems to be that the trial court did not go through the same formal procedure in determining whether Ricardo Vielmas was qualified to act as defense-interpreter.

After the state had rested an incident took place concerning which defendant makes no complaint but which involved testimony of Ricardo Vielmas. Vielmas testified that he was a friend of the defendant and that he had been seated at the counsel table with defendant and had been "visiting with him and talking with him throughout." Vielmas testified that he, Vielmas, spoke Spanish—"I have worked with Cuban people for about five years in Miami, Florida, in the ministry. I grew up in San Antonio, Texas. My parents speak Spanish and are of Mexican descent. I happen to be here today because Mr. Gonzalez needed someone so I volunteered—I just took the initiative." Vielmas also testified that he had been acquainted with the defendant for 12 months as defendant's minister and that he had met with defendant at least once a week. The trial court made a comment, unchallenged by counsel, that Vielmas was "highly versed in the Spanish language."

Only a few Missouri cases deal with the matter of interpreters in criminal cases. In *State v. Chyo Chiagk*, 92 Mo. 395, 4 S.W. 704 (1887), the defendant, a Chinaman, testified through a witness-interpreter. Defense counsel objected to the form of the oath administered to the interpreter. Although the conviction was reversed on other grounds, the court pointed out that defense counsel should have been afforded the opportunity to show, before the interpreter began his duties, that the oath administered was not binding on his conscience and that there was a form of oath which the witness did regard as binding. The court also said that defense counsel was entitled to show that the interpreter was incompetent and not impartial. The court said, 4 S.W. at p. 709, "The defendant was entitled to an interpreter at once capable and impartial; one who could and would be the medium and conduit of an accurate and colorless transmission of questions to and answers from the witnesses. All the precautions necessary to attain this end should have been taken."

In *State v. McGinnis*, 158 Mo. 105, 59 S.W. 83 (1900), the defendant complained of the action of the trial court in appointing, at the prosecutor's suggestion, a witness-interpreter for a state's witness. There was no showing by the defense that the witness could speak English well enough to be examined in English and it was held that the trial court did not err in making the appointment.

In *State v. Aguelera*, 326 Mo. 1205, 33 S.W.2d 901 (1930), the trial court denied a defense request for an appointment of a witness-interpreter and a defense-interpreter. The supreme court held that the trial court did not abuse its discretion in denying the request where there was uncontradicted testimony that the Mexican defendants, whose primary language was Spanish, understood English and spoke it intelligently. The court cited what is now § 476.060 which reads: "The courts may, from time to time, appoint interpreters and translators to interpret the testimony of witnesses, and to translate any writing necessary

the defendant appeared in circuit court and entered his plea of not guilty. The court's entry shows "interpreter appeared with defendant."

Authority exists to the effect that the absence of an interpreter at a preliminary hearing is not prejudicial error. *Flores v. State*, 406 So.2d 58 (Fla.App.1981). See also *U.S. v. Paroutian*, 299 F.2d 486, 490[7] (2d Cir.1962); *People v. Castillon*, 132 Ill.App.2d 581, 270 N.E.2d 268 (1971).

to be translated in such court or any cause, therein." The court said that if there was no statute the trial court's power to appoint interpreters would exist "of inherent necessity."

In 1978 Congress enacted the Court Interpreters Act, 28 U.S.C.A. § 1827, which applies to criminal and certain civil actions in the United States District Courts. The Act requires the court to utilize the services of "the most available certified interpreter," if the court determines that a party (including a defendant in a criminal case) or a witness "speaks only or primarily a language other than the English language, ... so as to inhibit such party's comprehension of the proceedings or communication with counsel or [the court], or so as to inhibit such witness' comprehension of questions and the presentation of such testimony." The Act further provides that persons "other than witnesses" may waive, with the court's permission, their entitlement to a court-appointed interpreter and use their own interpreter instead.

There is substantial authority, including federal cases antedating the Court Interpreters Act, holding that the denial of the services of a needed defense-interpreter impairs not only the defendant's due process rights, but also his rights to confront adverse witnesses, to the effective assistance of counsel, and to be present at his own trial. They include *United States ex rel. Negron v. State of New York,* 434 F.2d 386 (2d Cir.1970); *United States v. Carrion,* 488 F.2d 12 (1st Cir.1973); *State v. Natividad,* 111 Ariz. 191, 526 P.2d 730 (1974); *People v. Carreon,* 151 Cal.App.3d 559, 198 Cal.Rptr. 843 (1984); *State v. Linares,* 192 N.J.Super. 391, 470 A.2d 39 (1983); *Application of Murga,* 631 P.2d 735 (Okla.1981); *Commonwealth v. Pana,* 469 Pa. 43, 364 A.2d 895 (1976); *Baltierra v. State,* 586 S.W.2d 553, 556–559 (Tex.Cr.App.1979). See, generally, 36 A.L.R.3d 276—Right of Accused to Have Evidence or Court Proceedings Interpreted.

In *Negron,* an oft-cited case on which defendant primarily relies, the court, in a habeas corpus proceeding, held that a Spanish-speaking defendant in a state criminal case was entitled to the services of a translator and that the failure to provide those services rendered the trial constitutionally infirm, even though an interpreter employed by the prosecution had given the defendant resumes of the proceedings from time to time. The court held that the Sixth Amendment's guarantee of the right to be confronted with adverse witnesses, applicable to the states through the Fourteenth Amendment,[6] includes the right to cross-examine those witnesses and that Negron had been denied those rights. "[E]ven more consequential," said the court, was the denial of Negron's right to be present at his own trial unless by his conduct he waived that right. Also infringed was Negron's right to consult with his attorney. Finally, the court held that Negron's constitutional right to a defense-interpreter was not waived by his mere failure to request one.

In *Perovich v. United States,* 205 U.S. 86, 27 S.Ct. 456, 51 L.Ed. 722 (1907), the defendant challenged his murder conviction on the ground that the trial court had failed to appoint an interpreter when he was testifying. In upholding the conviction the United States Supreme Court said: "This is a matter largely resting in the discretion of the trial court, and it does not appear from the answers made by the witness that there was any abuse of such discretion." 205 U.S. at 91, 27 S.Ct. at 458.

In *State v. Neave,* 117 Wis.2d 359, 344 N.W.2d 181, 183 (1984), the Supreme Court of Wisconsin said, "Clearly the discretion referred to in *Perovich* is to determine the factual question of whether an interpreter is needed; a trial court does not have discretion to decide whether a defendant who needs an interpreter has a legal entitlement to one. *United States v. Carrion,* 488 F.2d 12 (1st Cir.1973) cert. denied 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974)."

Some courts have held that the role of an attorney is such that even if he is bi-lingual

6. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13     L.Ed.2d 923 (1965).

he may not adequately function both as an attorney and as a defense-interpreter. *State v. Rios,* 112 Ariz. 143, 539 P.2d 900 (banc 1975); *People v. Chavez,* 124 Cal. App.3d 215, 177 Cal.Rptr. 306 (1981).

Cases involving an interpreter selected by the defendant include *State v. Montalvo,* 324 N.W.2d 650 (Minn.1982), and *People v. Rivera,* 13 Ill.App.3d 264, 300 N.E.2d 869 (1973). In *Montalvo* defendant claimed on appeal that the trial court gave inadequate instructions to the defense-interpreter whom defendant himself selected. Rejecting that contention the supreme court said: "[D]efense counsel easily could have and probably did make it clear to [the defense-interpreter] that she should translate for defendant everything that was said both at the omnibus hearing and at trial. We cannot presume, as defendant would have us do, that the interpreter did not adequately interpret the trial for him. Stated differently, defendant has failed to meet his burden of proving on appeal that the interpretation was inadequate."

Similarly, in *Rivera,* the trial court acquiesced in defense counsel's suggestion that a co-defendant act as defense-interpreter. The record failed to show whether or not any interpretation in fact occurred. The appellate court rejected defendant's argument that it should "indulge in the negative inference that therefore no interpretation did in fact occur."

A careful reading of defendant's point discloses that he is not complaining that he did not receive the benefit of the services of a defense-interpreter. His complaint is that the trial court erred in not *appointing* one. The fact is that Ricardo Vielmas, a friend of defendant, was at his side at the counsel table from the beginning of the trial until the final arguments commenced. Vielmas spoke Spanish and was there because defendant "needed" him.

This is not a case of waiver of the right to a defense-interpreter nor of the adequacy of a purported waiver. This is not a case of the denial of the right to a defense-interpreter. This is a case of the exercise of that right. There is nothing in the record to indicate that Vielmas was in any way deficient in serving as defense-interpreter and what is in the record strongly indicates otherwise. This court will not indulge the presumption that Vielmas did not adequately fill the role. The trial court did not commit plain error in failing to go through the formality of "appointing" Vielmas as defense-interpreter. Defendant's second point has no merit.

The judgment is affirmed.

GREENE, C.J., and TITUS and CROW, JJ., concur.