**STATE of Missouri, Plaintiff–Respondent,**

v.

**Stacey Lee HUNTER, Defendant–Appellant.**

**No. 55786.**

Missouri Court of Appeals, Eastern District, Division Six.

Dec. 5, 1989.

Rehearing Denied Jan. 3, 1990.

Robert Wolfrum, Asst. Public Defender, St. Charles, for defendant-appellant.

William L. Webster, Atty. Gen., John P. Pollard, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HAMILTON, Judge.

A jury convicted Appellant Stacy Lee Hunter (hereinafter Hunter) on one count of murder first degree, Section 565.020 RSMo 1986,[1] one count of robbery first degree, Section 569.020, and two counts of armed criminal action, Section 571.015. The trial court thereafter sentenced him to consecutive terms of life imprisonment with no possibility for probation or parole on the count of murder first degree and to

---

1. All further statutory references shall be to RSMo 1986 unless otherwise noted.

life imprisonment on each of the remaining three counts.

Hunter appeals these convictions, asserting that the trial court erred in (1) granting the State's motion to strike juror Tull for cause; (2) failing to strike juror Matkin for cause; (3) overruling his objection to the testimony of State's witness Tracy Guccione; and (4) overruling his motion for a judgment of acquittal. We affirm.

Viewing the evidence in the light most favorable to the verdict, the evidence discloses the following facts. On August 18, 1987, at about 11:00 a.m., Hunter, Ken McFadden (hereinafter McFadden), and Tracy Guccione (hereinafter Guccione) went fishing on the Big River underneath Highway 30 in Cedar Hill, Missouri. All three began drinking beer. After approximately one-half hour, they moved to the "river access" at Cedar Hill where they went swimming, played horseshoes, and continued drinking beer. Larry Harris (hereinafter Harris) joined the group about 4:30 or 5 p.m., as did John Peter (hereinafter Peter), who had also been drinking and appeared intoxicated. After some socializing at the river access, Peter invited Hunter, McFadden, Harris, and Guccione to his home to watch movies. Guccione rode with McFadden in the latter's Volkswagen. They followed Peter who drove a tow truck with Hunter and Harris as passengers.

Upon arriving at Peter's house about 7 p.m., the group watched a movie, continuing to drink beer and to socialize. At one point, Guccione, needing to relieve himself, went outside, unlocking a sliding glass back door and relocking it upon his return. Hunter thereupon looked at Guccione and unlocked the door. Shortly thereafter, Hunter announced, in a voice loud enough to be heard, that "[t]hat TV and VCR is mine." The group then left to buy more beer and returned to Peter's house.

After watching a movie for a time, they moved outside to the driveway where they talked and drank beer. After about forty-five minutes to one hour, Guccione heard Appellant Hunter say to Harris, "Let's roll the guy." Harris responded, "It's been too long." Hunter repeated the statement two or three times, glancing at Harris and McFadden. Hunter and Harris then walked to the edge of the driveway talking. When Guccione approached them, Harris told Guccione that he and Hunter were having a private talk. Guccione then rejoined the others and finished drinking his beer.

A discussion ensued when John Peter, having let his dogs out, told Hunter and Guccione not to pet them. Immediately thereafter, McFadden lunged at Peter, hitting him on the back of the head with a four-by-four piece of wood that had been lying next to one of the cars in the driveway. Peter instantly fell to the ground. McFadden and one of the others dragged Peter's body into the house.

Hunter entered the house, wiping fingerprints off doors and other areas of the house. McFadden again hit Peter with the four-by-four. Meanwhile, Harris removed the TV and VCR from the living room and put them into McFadden's car.

Harris and Guccione got into the car. Three to five minutes later, Hunter and McFadden, who was holding a knife, came out of the house. Hunter yelled at McFadden, "You never stab somebody that many times. You're stupid." They then got into the car.

Leaving the scene of the murder, Appellant Hunter instructed McFadden to drive to the house of Rusty Hoffman. Hunter had previously told Hoffman he would try to obtain a TV and VCR for him. During the ride to Hoffman's house, Hunter ridiculed McFadden, saying, "I bet Ken has nightmares. I bet it's the first time Ken did something like that." Arriving at Hoffman's house, Hunter, directing the others to remain, left the car, taking the TV and VCR with him, and entered Hoffman's house. When Hunter returned to the car, he instructed McFadden to drive to Larry Hood's house. After five or ten minutes, the group returned to Peter's house to retrieve McFadden's car speakers.

The following day, Peter's body was discovered by his wife Tammy Peter when she arrived at his house. Detective Robert Sheetz later interviewed Hunter in connec-

tion with the murder. Hunter furnished a written statement which disclosed no knowledge of John Peter's death.

In his first two points on appeal, Hunter challenges the trial court's rulings with respect to two prospective jurors. We find no error in each instance.

■■■ Principles applicable to jury selection are well-established. An accused must be provided a full panel of qualified venirepersons from which to make the statutory number of peremptory challenges. *State v. Engleman*, 634 S.W.2d 466, 471 (Mo. 1982). In determining the qualifications of individual venirepersons, the trial court has broad discretion, and its ruling will remain undisturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. *State v. Hopkins*, 687 S.W.2d 188, 189 (Mo. banc 1985). Moreover, each challenge for cause to a venireperson must be judged on its facts. *State v. Stewart*, 692 S.W.2d 295, 298 (Mo. banc 1985). The trial court's decision with respect to such a challenge is made on the basis of the entire examination, not merely upon a single response. *State v. Murray*, 744 S.W.2d 762, 769 (Mo. banc 1988), *cert. den.* — U.S. —, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). Furthermore, that decision necessarily involves a judgment based upon observation of a prospective juror's demeanor and, considering that observation, an evaluation and interpretation of his or her responses as they relate to whether he or she would be fair and impartial if chosen as a juror. *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc 1983); *State v. Schwer*, 757 S.W.2d 258, 262 (Mo.App. 1988). Because the trial court can observe the demeanor and hear the responses of venirepersons, we resolve doubts as to its findings in its favor. *Id.* Accordingly, the law attaches a strong presumption that the jury tendered at the outset of the trial has been properly selected. *State v. Bynum*, 680 S.W.2d 156, 160 (Mo. banc 1984).

■■■ During voir dire, the prosecutor informed the jury panel that, in return for Tracy Guccione's testimony, the State had agreed not to prosecute him for his role in Peter's killing. The prosecutor then asked whether any venireperson felt that that agreement would taint Guccione's testimony or would make Guccione less credible than any other witness. Venirewoman Patricia Tull (hereinafter Tull) responded that she would have "a hard time with it." She further stated she had "a lot of questions" about that agreement and the plea bargaining, and it bothered her. When asked whether the agreement regarding nonprosecution would affect her judgment on the rest of the case, she answered, "No." Yet, when asked whether the agreement would affect her ability to determine whether Guccione were telling the truth, she stated that it "might be a problem." She admitted she would not totally "throw out" Guccione's testimony because of the agreement and felt she could still determine whether he was testifying truthfully.

Under further questioning by defense counsel, Tull stated that she "really has a problem with plea bargaining." When asked whether receiving something in exchange for testifying would affect a person's motive to lie, Tull answered:

> I'm really saying that I really do have a problem with that. It seems that I personally feel that they really shouldn't get off. If they were involved in the same crime, just because they turned State's evidence why do they have the right to go scott free without a term and someone else pay the price.

She then added, "I think I could be fair, but I would really sit and really try to discern, I would be really careful about what I listened to, and—"

The trial court later struck Tull for cause, relying upon the State's motion and argument that Tull could not fairly evaluate Guccione's testimony due to the agreement not to prosecute. During recess, the trial court reviewed the testimony of Tull and two other venirepersons and reaffirmed the original ruling to strike Tull for cause.

A review of the entire examination of Tull discloses no clear abuse of discretion by the trial court. The record demonstrates she was concerned about plea bargains, a term she used to describe the

Guccione situation wherein one involved in a crime who turns State's evidence goes "scott free without a term and someone else pay[s] the price." In view of the record, including the trial court's review of the voir dire examination, we find no error. Point one is denied.

■ In his second point, Hunter asserts error with respect to the trial court's refusal to strike Venirewoman Matkin (hereinafter Matkin) for cause after she indicated an inability to consider Guccione's motive to lie. In response to defense counsel's question whether she could consider whether a person has arranged to have charges against them dismissed in evaluating the credibility of that person, Matkin stated she would "take at face value what they are saying." She also stated that "[y]ou just have to be your own judge" and that she would "try to keep an open mind." Later, she indicated she would "try not to" consider what a person is getting and what motive he might have to lie.

Defense counsel moved to strike Matkin for cause, arguing she would try not to consider what motive a witness had to lie. The prosecutor countered that Matkin had said she would take testimony at face value. The trial court overruled defense counsel's motion to strike. During a recess, the trial court reviewed the voir dire transcript of Matkin, Tull, and Adkins, another venireperson. The original ruling with respect to Matkin was reaffirmed.[2]

The voir dire examination of Matkin reveals no clear abuse of discretion by the trial court. Having the benefit of observing Matkin and hearing her responses, we cannot say the trial court erred in choosing to believe that Matkin would be her own

judge and keep an open mind. Moreover, we note the record shows that Matkin did not serve on the jury. Any prejudice she may have possessed was not exhibited to other jurors during the deliberations that resulted in Hunter's conviction. *State v. Vaughn*, 736 S.W.2d 437, 438 (Mo.App. 1987). We refuse to disturb a decision of the trial judge absent a clear abuse of discretion and absent a real probability of injury to the complaining party. *Id.* We therefore deny point two.

■ In his third point on appeal, Hunter asserts the trial court erred when it overruled his counsel's objection to certain testimony of Tracy Guccione, a State's witness. Guccione claimed that the police tape recorded their interview of him. The police, however, recalled no such tape recording.[3] Appellant Hunter contends that the State should have been bound by Guccione's testimony that a tape recording of the interview existed and that the State's failure to disclose the tape recording to the defense violated his due process rights. We disagree.

Essentially, Hunter raises an issue of credibility in this point. Under Missouri law, the trier of fact may believe or disbelieve all, part, or none of the testimony of a witness. *State v. Buster*, 753 S.W.2d 118, 119 (Mo.App.1988). Here, the evidence presented to the jury raises a factual issue concerning the existence of a tape recording. The trial court's ruling correctly recognized that resolution of that issue is a credibility determination solely within province of the jury. *State v. Reasonover*, 714 S.W.2d 706, 712 (Mo.App.1986). Point denied.

2. Hunter's brief contained a lengthy and speculative discussion about the trial judge's error in reaffirming his original ruling as to Matkin. The transcript contained typographical errors in that Matkin's name was in some portions spelled as "Atkin" which was similar to the name of another venireperson. Hunter, therefore, asserts that the trial court relied upon words erroneously read back to him by the court reporter. He speculates that the responses of Matkin were mistaken by the trial court for those of Adkins. We are in no better position than is Hunter to speculate about an undoc-

umented error. In fact, an inference can be made that the trial court confused neither of the surnames. His ruling, after reconsideration at recess, clearly identified Matkin with no typographical error.

3. Guccione testified the police tape recorded his statement to them on August 20, 1987. The prosecutor and defense counsel stipulated that, if the two police officers involved took the stand, they would have testified that they recalled no tape recording.

In his final issue, Hunter contends the trial court erred in overruling his motion for judgment of acquittal because the State failed to present evidence regarding deliberation by him.

In considering a challenge to the sufficiency of the evidence, we view that evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the verdict, and we ignore all contrary evidence and inferences. *State v. Mallett*, 732 S.W.2d 527, 530 (Mo. banc 1987). Moreover, we are cognizant that liability as an accomplice for murder first degree requires that one "aid another or others with the conscious object of causing the offense." *State v. White*, 622 S.W.2d 939, 945 (Mo. banc 1981). Proof of dual intent, that is, both an intent to commit murder after coolly and fully reflecting upon it and an intent purposely to promote the commission of murder is not required to establish accomplice liability for murder first degree. Proof of the latter intent is sufficient. *State v. Johns*, 679 S.W.2d 253, 259 (Mo. banc 1984); *State v. White*, 622 S.W.2d 939, 944–5 (Mo. banc 1981).[4]

The record before us contains substantial evidence to support Hunter's conviction. Present at the scene of the crime, Hunter acted affirmatively to expedite its commission. He planned to rob the victim Peter of a TV and VCR after promising George Hoffman he would obtain those items for him. Hunter stated more than once to Harris, "Let's roll the guy," then spoke privately to him. When McFadden began striking Peter, Hunter failed to intercede. Instead, he scolded McFadden later for repeatedly stabbing Peter. He also wiped the crime scene of fingerprints and disposed of the stolen property by delivering it to Hoffman's house. Hunter thus actively associated with McFadden, Harris, and Guccione before, during, and after commission of the crime. Proof of any form of participation by a defendant in the crime suffices to support conviction as an accomplice and his presence at the scene, his companionship and conduct before and af-

ter the offense are circumstances from which participation in the crime may be inferred. *State v. Gonzalez–Gongora*, 673 S.W.2d 811, 813 (Mo.App.1984). Similarly, the state of mind or the mental state can be inferred from a consideration of all the circumstances, including the defendant's actions before, during, and after the assault. *State v. Stewart*, 714 S.W.2d 724, 726 (Mo.App.1986) (quoting *State v. Roberts*, 709 S.W.2d 857, 862 (Mo. banc. 1986)).

The jury determined that Hunter acted with or aided McFadden in causing Peter's death. Because the record amply supports the jury's verdict, the judgment of the trial court is affirmed.

GRIMM, P.J., and SIMEONE, Senior Judge, concur.

---

**4.** In both *State v. Johns* and *State v. White*, *supra*, the defendants were charged with and convicted of capital murder. That crime corresponds to the crime with which Hunter was charged and of which he was convicted, murder first degree.