[No. B014751. Second Dist., Div. Five. Oct. 3, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND ARANDA, Defendant and Appellant.

[No. B019502. Second Dist., Div. Five. Oct. 3, 1986.]

In re RAYMOND ARANDA on Habeas Corpus.

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Richard Avila, Deputy State Public Defender, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Gary R. Hahn and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FEINERMAN, P. J.**—After a jury trial, defendant, Raymond Aranda, was convicted of one count of first degree murder and one count of assault with force likely to produce great bodily injury. An allegation that defendant used a knife in the commission of the murder was found to be true. A motion for new trial was denied. Defendant was sentenced to 25 years in state prison on the murder count, plus a consecutive one-year enhancement for the use allegation. (Pen. Code, § 12022, subd. (b).) He was sentenced to a three-year concurrent term on the assault count. He was credited with 305 days of presentence custody, plus 152 days of conduct credit. Defendant filed notice of appeal and also filed an original habeas corpus petition in this court in which he alleges incompetence of trial counsel. We consolidated the habeas corpus petition with the appeal and issued an order to show cause so that we might consider the issues raised on the most complete record possible.

### BACKGROUND

On August 11, 1984, Veronica Varela (Varela) lived in an apartment in Wilmington with her husband, three children, and an 18 year-old nephew, Miguel Rios (Rios). There was an alley behind the apartment and a laundry room near the alley. Varela had a portable radio-cassette player which cost $270. She had taken the radio outside and placed it on a broken washing

machine near the laundry room. At about 11:15 p.m., Varela was outside listening to music on her radio with her nephew and a neighbor, Juan Cuellar (Cuellar). Varela's 11-year-old son, Manuel Gutierrez (Manuel), was outside riding his bike.

Three Latino men came by. Varela estimated the age of the youngest at 18 or 19. The oldest of the three was about 30 or 31. Varela identified defendant as the third man. The other two were not identified at trial.

The youngest man addressed Cuellar in English, calling him a son of a bitch, broke a bottle and tried to hit Cuellar on the head with it. The bottle shattered against a wall. Varela ran in fear to her apartment, some 20 feet away. Rios accompanied her. When she got to the door of the apartment, Cuellar ran past her, chased by the oldest of the three men. The other two men remained in the alley. Varela did not know they were still there, however, because they were behind a trash dumpster.

Varela waited inside her apartment for two or three minutes. Cuellar and the oldest man did not come back. Rios and Varela went back outside to get the radio-cassette player which was still on the washing machine. As Rios reached the washing machine, defendant stabbed him in the chest and ordered the youngest man, in Spanish, to grab the radio-cassette player. The youngest man grabbed it and he and defendant fled. Rios later died of a stab wound to the heart. Varela had been right behind Rios when he was stabbed. She had seen an object in defendant's hand, but she could not tell if it was a knife, a pick or something else.

Varela recognized defendant as someone she had seen in the neighborhood several times. She had seen him along Anaheim Boulevard, walking near the park, and near a Thrifty Drug Store on Avalon. When she saw him, he was accompanied by friends. She noticed defendant because he and his friends dressed in "Cholo" style. She was very much afraid of the Cholos and would run by when she saw them. Defendant and his friends were dressed in Cholo style on the night of the crime.

When the police came after the stabbing, Rios was taken to a hospital and Varela was taken to the police station where she looked through books of photographs for three or four hours. She saw defendant's photograph in three of the books and recognized him right away, but she lied to the police and said that she could not identify anyone because she was frightened and did not want to get involved as a witness. The following day, after she learned that Rios had died, she identified the photographs of defendant for the police. Varela no longer lived in the same apartment at the time of trial.

Los Angeles Police Department Officer Catarino Marquez (Marquez) testified that he had a telephone conversation with Varela on August 12, 1984, after which Varela came to the police station. Varela indicated that she could identify her nephew's killer, but asked for police assistance in guaranteeing her safety. Marquez indicated that he would move Varela and her family to a secret location. Varela then looked through four or five books of photographs and identified defendant's photograph in three different books. Within a matter of days afterwards, Marquez did take steps to move Varela and her family to a secret location.

Cuellar testified that he saw two men approach him on the night in question. He had never seen them before. Defendant was one of the men; the second man was younger than defendant. The younger man kicked Cuellar, struck him with one hand, and tried to hit him with a bottle held in his other hand. Cuellar ducked and the man threw the bottle at him. Defendant then approached Cuellar and grabbed his shirt. Cuellar struggled with defendant and backed him into a fence.[1] Cuellar managed to break free by removing his shirt. Cuellar then backed up and defendant pulled a knife. Cuellar ran. Defendant pursued him for a short distance, stopping near the washing machine. Cuellar continued running and did not go back to the apartment that night. The next day Cuellar went to the police station and picked photographs of defendant out of three different books. The attack on Cuellar formed the basis for the assault charge against defendant.

Manuel testified that he saw two men hitting Cuellar. Cuellar was not hitting them back. Manuel saw his mother and Rios go to their apartment and then return for the radio.[2] He saw defendant stab Rios. Rios did not have a weapon. Manuel recognized defendant as someone he had previously seen at the park. He recognized him by his distinctive dress style. On August 13, 1984, Manuel picked defendant's photograph out of a group of six photographs shown to him by police.

On cross-examination, Manuel admitted that he had been unable to identify defendant at the preliminary hearing. On redirect, the prosecutor established that while Manuel initially had been unable to identify defendant when he saw him full-face at the preliminary hearing, Manuel did recognize defendant when Manuel saw his profile as Manuel left the witness stand. Manuel so informed the prosecutor at the preliminary hearing, returned to the stand and identified defendant.

---

[1] At the time of his arrest, defendant had scrapes on his back which could have been made by the fence.

[2] On cross-examination, Manuel testified that his mother stayed inside the apartment and did not follow Rios out.

Marquez worked in the Wilmington area. He had known defendant for five years and saw him on almost a daily basis. Defendant customarily wore a beard. Varela and Cuellar both testified that defendant had a beard on August 11, 1984. Marquez arrested defendant on August 13, 1984, near the Thrifty Drug Store at Anaheim and Avalon, one block from Varela's apartment. Defendant had shaved off his beard. Marquez asked him why he had shaved off the beard. Defendant said that he just felt like shaving it.

The defense called three of defendant's friends as witnesses. John Romero (Romero) had known defendant for seven or eight years. On August 11, 1984, they met at about 3 p.m. and spent the next four hours out on the street "just kicking back, horseplaying." They were standing near the alley that ran behind Varela's apartment, but about a block away. When asked if there was anything special about that day, Romero said it was "[j]ust a regular day hanging around the street."

At about 7 p.m., defendant left with two other friends, Paul Rocka (Rocka) and Arlene Rivera (Rivera). Romero remained at the location for another three hours, then went home. At 11:15 p.m., he was in his home.

Romero was familiar with the Cholo style of dress. It was popular with teenagers in the neighborhood.[3] It was a noticeable style of dress. Romero was 26 and did not dress in that style. Romero had two prior felony burglary convictions.

Rocka and Rivera both testified that defendant was with them in Rocka's garage from 7 p.m. Saturday August 11, 1984, until 6 o'clock Sunday morning when defendant went home to change clothes and go to church.

Neither Rocka nor Rivera ever contacted any law enforcement officer to tell them that defendant was with them at the time of the homicide. Rocka refrained from doing so because he thought there was an outstanding warrant for him and because he was smoking marijuana that night and did not want to disclose that fact. Rocka visited defendant in jail and defendant asked him to be a witness for him. Rivera also testified that she did not come forward and tell police defendant was with her because she did not want to reveal that she had been smoking marijuana.

ISSUES RAISED

### I. DEFENDANT'S RIGHT TO AN INTERPRETER.

Defendant asserts, both on appeal and in his companion habeas corpus petition, that he was denied the effective assistance of counsel, the right to

---

[3]Defendant gave his age as 20 at the time of his arrest.

confrontation and cross-examination, and the right to an accurate transcript of the proceedings because his trial counsel failed to request the assistance of a defense interpreter. The issue is novel because defendant is English-speaking and did not require the assistance of an interpreter to communicate with his counsel. Varela and Cuellar were non-English speaking and testified through an interpreter. ■ It is defendant's contention that whenever a witness testifies through an interpreter, the defendant has an automatic constitutional right to his own interpreter; and that the right is personal to the defendant and cannot be waived by counsel. This contention has no merit.

Defendant relies on *People* v. *Aguilar* (1984) 35 Cal.3d 785 [200 Cal.Rptr. 908, 677 P.2d 1198]. Comparison of the facts of this case with *Aguilar* demonstrates the fallacy of defendant's position. ■ *People* v. *Aguilar, supra,* at p. 790, described the functions of interpreters as follows: "Interpreters play three different but essential roles in criminal proceedings: '(1) They make the questioning of a non-English-speaking witness possible; (2) they facilitate the non-English-speaking defendant's understanding of the colloquy between the attorneys, the witness, and the judge; and (3) they enable the non-English-speaking defendant and his English-speaking attorney to communicate . . . an interpreter performing the first service will be called a "witness interpreter," one performing the second service, a "proceedings interpreter," and one performing the third service a "defense interpreter."' (Chang & Araujo, *Interpreters for the Defense: Due Process for the Non-English-Speaking Defendant* (1975) 63 Cal.L.Rev. 801, 802; hereinafter cited as Chang & Araujo.) *While the three roles are interrelated they are distinct.*" (35 Cal.3d at p. 790. Italics added.)

■ *Aguilar* was concerned with the right to a "defense interpreter," a right grounded in article I, section 14 of the California Constitution, which provides that "[a] person *unable to understand English* who is charged with a crime has a right to an interpreter throughout the proceedings." (Italics added.) The sound premises behind the constitutional provision are that a defendant who cannot understand the proceedings taking place is not truly present at his trial, and a defendant who cannot communicate with his counsel is ipso facto denied effective representation.[4] It is these basic rights that counsel cannot waive for his non-English-speaking client.

■ By contrast, an English-speaking defendant, who is forced to await the "witness interpreter's" translation, stands in exactly the same position as the prosecutor, defense counsel, the judge and jury. Rather than such a

[4]The rights guaranteed by article I, section 14 are applicable to both the "defense interpreter" and "proceedings interpreter" functions described in *People* v. *Aguilar, supra,* 35 Cal.3d 785.

defendant being effectively absent from his own trial, the trial is, in effect, in a state of suspension until the translation is made.　■■■　The reason article I, section 14 is limited, by its terms, to non-English-speaking defendants is because only they are in need of its protection.

■■■　What both English-speaking and non-English-speaking defendants are entitled to is a *competent* "witness interpreter." (*People* v. *Estrada* (1986) 176 Cal.App.3d 410 [221 Cal.Rptr. 992].) The question of an interpreter's competence is a factual one for the trial court. (*People* v. *Mendes* (1950) 35 Cal.2d 537, 543 [219 P.2d 1]; *People* v. *Roberts* (1984) 162 Cal.App.3d 350, 355 [208 Cal.Rptr. 461].) The ideal time to question the qualifications of an interpreter is before he is permitted to act (*People* v. *Phillips* (1910) 12 Cal.App. 760, 763 [108 P. 731]), although, if the competence of an interpreter becomes an issue after he commences his duties, it can be raised at that time. (*People* v. *Estrada, supra,* 176 Cal.App.3d 410, 415-416.) When a showing is made, at trial, that an interpreter may be biased or his skills deficient, one solution may be appointment of a "check interpreter." (*People* v. *Phillips, supra,* 12 Cal.App. 760, 764.) ■■■　When no objection is raised to the competence of the interpreter during trial, the issue cannot be raised on appeal. (*People* v. *Estrada, supra,* 176 Cal.App.3d 410, 416; *People* v. *Roberts, supra,* 162 Cal.App.3d 350.)

In the instant case no such objection was raised below. Recognizing that the absence of an objection precludes review on appeal (*People* v. *Martinez* (1985) 171 Cal.App.3d 727 [217 Cal.Rptr. 546]), defendant asserts that his trial counsel was incompetent because he failed to request a defense interpreter to translate the witnesses' Spanish testimony and check the accuracy of the "witness interpreter's" translation. To the extent that the claim of incompetence is grounded on counsel's failure to recognize an English-speaking defendant's automatic right to a defense interpreter, it fails because no such right exists. To the extent that it is grounded on the premise that a factual basis existed for challenging the competence of the witness interpreter in this case, it is not substantiated by the record.

In support of their written return to the habeas corpus petition, the People have submitted an affidavit from defendant's trial counsel in which he alleges that he has served as a deputy public defender since his admission to practice in 1968 and that he has participated in hundreds of cases in which interpreters have been used for non-English-speaking witnesses. He further alleged that he represented defendant at the preliminary hearing as well as at trial. Varela testified through an interpreter on both occasions. The affidavit asserts: "Based on my experience as a criminal trial attorney, and on my ability to speak and understand some Spanish as a result of having had two years of Spanish in high school, I did not feel there were any accuracy or other

problems with respect to the interpretation of Mrs. Varela's testimony at trial. Had I felt there was a problem with the translation, I would have brought the matter to the attention of the court. *It is my belief that the interpretation of Mrs. Varela's testimony had no effect on the case.*" (Italics added.)

Counsel's quoted (emphasized) conclusion is overwhelmingly borne out by the record and by the weakness of defendant's showing in support of the habeas corpus petition. Defendant cites two instances in which he claims the translation of Varela's testimony was ambiguous, but he ignores the fact that in both instances her meaning was clarified by further examination. He cites the interpreter's inability to remember the Spanish word for sideburns, but he ignores the fact other descriptive language was employed by the interpreter to convey the necessary meaning. He cites a juror's request that the interpreter speak louder, and the court's request that the interpreter refrain from simultaneous translation and translate after the witness finished speaking, as evidence that a second interpreter was required. There is no allegation that defendant or his trial counsel had any difficulty hearing the interpreter or understanding the translation. It is entirely speculative whether a second interpreter would have eased defense counsel's burden of following the proceedings and conducting effective cross-examination, or only compounded it and added to whatever confusion may have existed. In any event, that was a decision for trial counsel.[5]

II. Prosecutorial Misconduct*

. . . . . . . . . . . . . . . . . . . . . . .

The judgment on appeal is affirmed. The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Ashby, J., and Eagleson, J., concurred.

A petition for a rehearing was denied October 20, 1986, and appellant's petition for review by the Supreme Court was denied January 14, 1987.

---

[5]Although not necessary to our decision, we note that Varela's testimony establishes that defendant spoke to his companion in Spanish. Yet, absent from the present record is any allegation by defendant that he was either incapable of understanding Varela's Spanish testimony, or that he understood it and detected inaccuracies in the translation.

*See footnote, *ante,* page 230.