José M. GONZALEZ, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–824.

District of Columbia Court of Appeals.

Submitted March 19, 1996.
Decided July 10, 1997.

**820**

Severina B. Rivera, Washington, DC, appointed by this court, was on the brief, for appellant.

Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III and Kristan L. Peters–Hamlin, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and PRYOR, Senior Judge.

1. D.C.Code § 33–541(a)(1) (1993).

TERRY, Associate Judge:

Appellant Gonzalez, a native of El Salvador, was convicted of distributing cocaine.[1] At trial he was assisted by a court-appointed interpreter. On appeal he contends (1) that the trial court erred in failing to make a preliminary determination that the interpreter was competent to translate the proceedings for him; (2) that the court impermissibly allowed an expert government witness to testify beyond the scope of his expertise; and (3) that a photograph taken at the time of his arrest should not have been admitted into evidence. As to the first contention, we agree that the court erred but hold that the error was harmless. The second and third arguments are without merit. Accordingly, we affirm appellant's conviction.

**I**

On the early evening of December 2, 1993, Metropolitan Police Officers Collis Timlick and Michelle Green set up an undercover narcotics operation in the 3100 block of Mount Pleasant Street, N.W. They entered the area wearing plain clothes and driving an unmarked car. While Green remained in the car, Timlick got out and walked over to a man who was standing on the east side of the street. He told this man that he was looking for a "twenty," meaning a $20 rock of crack cocaine. The man signaled Timlick to follow him across the street. There they met appellant Gonzalez, who was sitting on a bicycle in front of a pool hall. After Gonzalez and the unknown man had a conversation in Spanish, the three of them proceeded a short distance up the street to a bus stop in front of 3102 Mount Pleasant Street. When they reached the bus stop, Gonzalez and the other man again conversed in Spanish. Gonzalez then pulled three ziplock bags from inside the waistband of his trousers and gave all of them to the unknown man, who in turn gave two of them to Timlick. Each of the two bags contained a small rock-like object. Timlick then handed the unidentified man two pre-recorded $10 bills,[2] which he gave to Gonzalez.

2. Earlier that day, Officer Green had obtained $50 in police funds for use in the undercover

Officer Green testified that she watched the entire transaction from the car. She was able to discern Gonzalez on his red bicycle and could see that the three men were engaged in conversation. She also saw "arms moving back and forth" among the three men, but from her vantage point she could not tell whether any objects were passed from one to another.

When the transaction ended, Timlick returned to the car, while Officer Green broadcast a description of the two men she had seen engaged in an apparent drug transaction with her partner.[3] The two officers then followed Gonzalez, who was riding away on his bicycle, in order to keep the arrest team apprised of his whereabouts. After a few moments, Detective David Stroud, a member of the arrest team, radioed Timlick and Green and informed them that the team had stopped a suspect (Gonzalez) who matched the description and who had in his possession the two pre-recorded $10 bills.[4] Timlick and Green then drove their car past the point where the arrest team had stopped Gonzalez, and both of them positively identified him.[5] A later chemical analysis established that both of the rocks Timlick bought from Gonzalez were crack cocaine.

The government also presented, without objection, the expert testimony of Detective Charles Culver, who described to the jury the methods commonly used by drug sellers to distribute cocaine. He testified about the roles of "runners" and "holders" in the sale of drugs on the street, and explained that the runner sometimes receives drugs from the holder as compensation for his services. Detective Culver also outlined the procedures followed by the police department and the Drug Enforcement Administration in handling and sealing evidence recovered in narcotics cases. On direct examination Culver testified that the two rocks of cocaine in this case had been properly heat-sealed and that the sealed envelopes showed no signs of tampering; however, he was not asked whether the envelopes containing the money seized from Gonzalez had been tampered with, or whether the proper chain of custody had been followed with respect to them.[6] Defense counsel elicited testimony from Detective Culver on cross-examination about the handling and processing of the two envelopes containing the monetary evidence.

Gonzalez was the sole defense witness. He testified that around 6:30 p.m. on the evening of December 2, he left his home to buy drugs and rode his bicycle to the 3100 block of Mount Pleasant Street. There he met his friend and main drug supplier, "Carlos," at a Seven–Eleven store.[7] When Gonzalez asked Carlos if he had any drugs to sell, Carlos told him to wait at a pool hall near the Seven–Eleven. Gonzalez then stood

---

operation. After recording their serial numbers, she gave two $10 bills to Officer Timlick for him to use in a potential undercover buy.

3. After Timlick got back in the car, Green repeated to him the lookout she had given. Timlick confirmed her description.

4. The arrest team seized two $10 bills from Gonzalez's hand. Detective Stroud, who was in radio communication with Officer Green, asked Officer Timlick to read from his buy card the last four digits of the serial numbers of the bills he had used in the undercover buy; they matched those on the bills that appellant had in his hand.

The officers also found an additional $21 in Gonzalez's pocket. Detective Stroud gave this money, along with the $20 seized from Gonzalez's hand, to Officer Milton Norris for processing. Officer Norris put the two pre-recorded $10 bills in one envelope, signed the envelope, sealed it, and gave it to the police department property clerk. The $21 was similarly sealed in a separate envelope and turned over to the property clerk.

5. The officers estimated that they were between thirty-five and fifty feet away from Gonzalez at the time of their drive-by identification.

6. On cross-examination, defense counsel sought to ask Detective Culver whether the money evidence showed signs of tampering, but the court curtailed this line of questioning because Culver had never testified on direct examination that there had been any tampering. What he had said on direct was that the envelope containing the $21 from Gonzalez's pocket had a seal on it. After being asked by the prosecutor why monetary evidence would be heat-sealed, Culver explained that seals prevent tampering and protect the chain of custody.

7. Gonzalez said that he had been purchasing drugs every day from Carlos for the past four and a half years. On cross-examination, however, he said he did not know Carlos' last name or where he lived.

at the bus stop where Officers Timlick and Green had said the drug transaction occurred. Five minutes later Carlos arrived with a man that Gonzalez did not know, who turned out to be Officer Timlick.

Gonzalez then reached into his waistband, pulled out a $20 bill, and asked Carlos for drugs. Carlos took the money and, according to Gonzalez, engaged in a transaction with Timlick. When that was completed, Carlos turned back to Gonzalez, handed Gonzalez his $20 back, and told him that he had no more drugs to sell.[8] Gonzalez then left the bus stop and went to call his wife from a pay phone. While he was making the call, two police officers stopped him and said he was being detained. Gonzalez admitted that he had two $10 bills on him when he was stopped.

## II

Gonzalez contends that the trial judge committed error by failing to ensure at the beginning of the trial that the court-appointed interpreter was competent. The government maintains that the issue of translator competence was not preserved for appellate review because defense counsel never objected at trial to the interpreter's translations. Thus the government argues that the trial court did not commit plain error, see *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc), when it failed to interrupt the proceedings *sua sponte* and determine the competence of the interpreter.

■ The District of Columbia Interpreter Act, D.C.Code §§ 31–2701 *et seq.* (1993), provides in part:

> Before appointing an interpreter, an appointing authority shall make a prelimi-

nary determination that the interpreter is able to accurately communicate with and translate information to and from the communication-impaired person involved.

D.C.Code § 31–2704.[9] Because no such preliminary determination was made, Gonzalez argues that both his "statutory and constitutional due process rights to participate fully in his defense" were violated. See *Redman v. United States*, 616 A.2d 336, 338 & n. 4 (D.C.1992) (defendant claimed that failure to make a preliminary determination of interpreter's competence violated his due process rights by rendering him incompetent to stand trial and to waive his right to testify on his own behalf); see also *Bassil v. United States*, 517 A.2d 714, 716 (D.C.1986) (defendant has a due process right "to present evidence, testimonial and otherwise, in his own defense"). Because the trial court failed to verify at the beginning of the trial that the interpreter was "able to accurately communicate with and translate information to and from" Gonzalez, D.C.Code § 31–2704, we agree with Gonzalez that the court erred. But the effect of this error, if any, was minimal.

■ Before considering the merits of Gonzalez's claim, there are two preliminary matters that we must address: whether Gonzalez sufficiently preserved this issue for appellate review, and if so, whether his claim should be reviewed for constitutional or nonconstitutional harmless error. As to the first point, although a defendant has the right to an interpreter who is "competent to render accurate translations," *United States v. Villegas*, 899 F.2d 1324, 1348 (2d Cir.), cert. denied, 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990),[10] the right to challenge the competence of a translator "may be waived if it is not raised in timely fashion."

---

8. Gonzalez testified that Carlos gave him two $10 bills, not the $20 bill that he had originally given to Carlos.

9. A "communication-impaired person" includes a person who does not speak English. D.C.Code § 31–2701(2). A "non-English speaking person" is defined, in turn, as:

> a person who is unable to readily understand oral and written communications in the English language or who cannot communicate effectively in the spoken English language.

D.C.Code § 31–2701(4). "Appointing authority" is defined to include a judge of any court of the District of Columbia "or any other person presiding at any hearing or other proceeding in which a qualified interpreter is required pursuant to this chapter [the Interpreter Act]." D.C.Code § 31–2701(1).

For a more detailed discussion of the Interpreter Act, see *Barrera v. United States*, 599 A.2d 1119, 1130–1133 (D.C.1991).

10. See also *United States v. Huang*, 960 F.2d 1128, 1135 (2d Cir.1992).

*Redman v. United States, supra,* 616 A.2d at 338; *accord, e.g., Villegas,* 899 F.2d at 1348; *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir.1989); *Delgado v. Walker,* 798 F.Supp. 107, 115 (E.D.N.Y.1992).[11] "[B]asic considerations of fairness demand no less." *Redman,* 616 A.2d at 338. As this court explained in *Redman:*

> Only if the defendant makes any difficulty with the interpreter known to the court can the judge take corrective measures. *To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse.*

*Id.* (quoting *Valladares, supra,* 871 F.2d at 1566) (emphasis added in *Redman* ); *see also Villegas,* 899 F.2d at 1348; *Delgado,* 798 F.Supp. at 115.[12]

As the government acknowledges in its brief, at one point during the trial Gonzalez alerted the court to a problem with the interpreter's translation.[13] On direct examination, defense counsel asked Gonzalez to describe how he had been stopped and arrested by the two police officers. The following exchange then took place:

> THE WITNESS (through interpreter): When the car stopped in the middle of the street, a white woman got out and a black guy, a tall black guy, and they said, "You are detained," and right away they got out of the car. I was on my bicycle. I didn't think anything bad because I hadn't done anything bad and they were just detaining me.

They asked me—they checked me out and the white woman said, "You are under arrest. You are not just detained. You are under arrest."

You haven't understood me well.

Mr. GEORGE [defense counsel]: Okay. Now—

THE COURT: Well, let me go back.

THE WITNESS (through interpreter): The interpreter hasn't understood me well.

THE COURT: Okay. I want you to— Mr. Gonzalez, I want you to restate what happened when the two people got out of the car.

THE WITNESS (through interpreter): When the two people got out of the car, they said to me, "Stop. Don't move. You are not under arrest. You are just being stopped. We are going to search you." I said okay, and she searched me and they took the money off of me, and then they handcuffed me there and they put me into the car.

 In asserting that the issue was not adequately preserved, the government makes much of the fact that Gonzalez, rather than his counsel, brought this mistranslation to the court's attention. However, we have never indicated *how* interpreter competence must be challenged in order to preserve the issue for appeal. *Cf. United States v. Urena,* 27 F.3d 1487, 1491–1492 (10th Cir.) (specific, contemporaneous objections to mistranslations, though preferable, are not required; generalized objections are sufficient), *cert. denied,* 513 U.S. 977, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994). We have said only that the defendant must make the translation difficulty known to the court so that the court

11. State court decisions are to the same effect. *See, e.g., People v. Aranda,* 186 Cal.App.3d 230, 237, 230 Cal.Rptr. 498, 502 (1986) ("[w]hen no objection is made to the competence of the interpreter during trial, the issue cannot be raised on appeal" (citing cases)); *Montoya v. State,* 811 S.W.2d 671, 673 (Tex.App.1991) (defendant must object to the competency of the interpreter at trial in order to preserve claim of error for appellate review); *State v. Besso,* 72 Wis.2d 335, 343–344, 240 N.W.2d 895, 899 (1976) (defendant's "acquiescence in the acceptance of the interpreter and her failure to object, even at this late date, to either his competence or bias evinces a waiver in respect to any objection to [the] interpreter").

12. There may, of course, be cases in which difficulties with the interpreter are not known either to the defendant or to counsel until after the trial has ended. In such a case, the defendant could not be accused of remaining silent and wagering on the jury's verdict. That situation, however, is not presented here, and thus we do not address it.

13. Gonzalez claims that the competence of the interpreter was also questioned on two other occasions. The portions of the transcript which he cites, however, merely show that the interpreter was having trouble finishing his simultaneous translations when counsel were repeatedly interrupting to make objections.

can take corrective measures. *See Redman, supra,* 616 A.2d at 338. In our view, Gonzalez did just that: he alerted the court to the interpreter's mistranslation, which permitted the court to take corrective measures by having Gonzalez repeat his answer. We are satisfied that Gonzalez sufficiently preserved the issue of interpreter competence for appellate review.[14]

■ The question that remains, then, is whether his claim should be reviewed for constitutional or non-constitutional error. Gonzalez assumes that his right to a competent interpreter is both statutorily and constitutionally mandated. The District of Columbia Interpreter Act, like its federal counterpart, 28 U.S.C. § 1827(d)(1) (1994), makes clear that the right to a competent interpreter is statutorily prescribed. No District of Columbia court has ever squarely

decided whether the right to a translator is also guaranteed under the Constitution, but this court in a recent case has strongly suggested that the right at least has constitutional overtones. *See Kim Long Ko v. United States, supra,* note 14, 694 A.2d at 79. Pertinent case law from both state[15] and federal[16] courts conveys the same message. In this case, however, we need not decide definitively whether the right to a translator is a constitutional right because, even if it is, we are satisfied that the trial court's failure to make a preliminary assessment of the interpreter's competence was harmless even under the stringent constitutional standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■■ Turning to the substance of Gonzalez's complaint, we begin by observing that

14. We recognize that a distinction can be drawn between a challenge to the competence of a translator during the course of a trial and a claim that the court failed to make a preliminary determination, before trial, of an interpreter's qualifications. *See Kim Long Ko v. United States,* 694 A.2d 73, 81 (D.C.1997) (opinion of Judge Schwelb). While that may be a distinction of some importance in other cases, we see no reason to rely on it in deciding this case.

15. *See, e.g., State v. Natividad,* 111 Ariz. 191, 526 P.2d 730 (1974); *People v. Aranda,* 186 Cal. App.3d 230, 236, 230 Cal.Rptr. 498, 501 (1986) (premise behind state constitutional provision that guarantees a defendant the right to an interpreter is "that a defendant who cannot understand the proceedings taking place is not truly present at his trial, and a defendant who cannot communicate with his counsel is ipso facto denied effective representation"); *People v. Estrada,* 176 Cal.App.3d 410, 415, 221 Cal.Rptr. 922, 924 (1986); *People v. Carreon,* 151 Cal.App.3d 559, 198 Cal.Rptr. 843 (1984); *State v. Gonzalez–Gongora,* 673 S.W.2d 811, 818 (Mo.App.1984); *State v. Linares,* 192 N.J.Super. 391, 470 A.2d 39 (1983); *In re Application of Murga,* 631 P.2d 735 (Okla.1981); *Commonwealth v. Pana,* 469 Pa. 43, 364 A.2d 895 (1976); *Montoya v. State,* 811 S.W.2d 671, 673 (Tex.App.1991) (state statute requiring the appointment of an interpreter, if necessary, "protects the defendant's right to confrontation under the state and federal constitutions"); *State v. Tuoc Ba Pham,* 75 Wash.App. 626, 633, 879 P.2d 321, 326 (1994).

16. *See, e.g., United States v. Mayans,* 17 F.3d 1174, 1180–1181 (9th Cir.1994); *United States v. Huang,* 960 F.2d 1128, 1135 (2d Cir.1992); *United States v. Joshi,* 896 F.2d 1303, 1309 (11th Cir.), *cert. denied,* 498 U.S. 986, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990); *United States v. Bennett,* 848 F.2d 1134, 1141 (11th Cir.1988) ("As a constitutional matter, the appointment of interpreters is within the district court's discretion"); *United States v. Jong Moon Lim,* 794 F.2d 469, 470 (9th Cir.) ("a defendant whose fluency in English is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter"), *cert. denied,* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986); *United States v. Tapia,* 631 F.2d 1207, 1209–1210 (5th Cir.1980); *United States v. Martinez,* 616 F.2d 185, 188 (5th Cir.1980), *cert. denied,* 450 U.S. 994, 994, 101 S.Ct. 1694, 1695, 68 L.Ed.2d 193 (1981); *United States v. Carrion,* 488 F.2d 12, 14 (1st Cir.1973), *cert. denied,* 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974); *United States ex rel. Negron v. New York,* 434 F.2d 386, 389 (2d Cir.1970).

As the court explained in *Joshi:*

The Court Interpreters Act, while underscoring the importance of ensuring the highest quality translations for non-English speaking defendants, does not create new constitutional rights for defendants or expand existing constitutional safeguards. Rather, the purpose of the Act is to mandate the appointment of interpreters under certain conditions and to establish statutory guidance for the use of translators in order to ensure that the quality of the translation does not fall below a constitutionally permissible threshold. The basic constitutional inquiry remains unchanged: whether any inadequacy in the interpretation made the trial fundamentally unfair.

896 F.2d at 1309 (citations and internal quotation marks omitted).

the determination of the competence of an interpreter is a matter entrusted to the sound discretion of the trial court, and its decision will not be disturbed on appeal unless that discretion has been abused.[17] *See, e.g., United States v. Urena, supra,* 27 F.3d at 1492; *United States v. Ball,* 988 F.2d 7, 9 (5th Cir.1993); *United States v. Paz,* 981 F.2d 199, 201 (5th Cir.1992), *cert. denied,* 508 U.S. 924, 113 S.Ct. 2378, 124 L.Ed.2d 282 (1993). "Because the decision to appoint an interpreter will likely hinge upon a variety of factors, including the defendant's understanding of the English language, and the complexity of the proceeding, issues, and testimony, the trial court, being in direct contact with the defendant, should be given wide discretion." *United States v. Coronel–Quintana,* 752 F.2d 1284, 1291 (8th Cir.) *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

Applying this standard to the instant case, we observe, first of all, that the government's case was "largely uncontradicted" and, "if credited by the jury, was compelling." *Redman, supra,* 616 A.2d at 338. Like the defendant in *Redman,* Gonzalez

> was identified as one of the sellers, within minutes of the sale, by the undercover officer who had just bought the drugs, and who had an excellent opportunity to observe him. The force of the officer's identification was enhanced by the recovery from [appellant's] person of the two [prerecorded] bills ... which the officer had used to purchase the cocaine.

*Id.* Second, it is obvious that Gonzalez himself, by pointing out the mistranslation to the court, had "some ability himself to monitor the questions and answers as conveyed by the interpreter." *United States v. Urena, supra,* 27 F.3d at 1493 (court took into account "that there were several instances in which defendant answered questions before they were translated"). Third, Gonzalez's testimony, as it appears (translated) in the

record, "as a whole presents a coherent picture consistent with the defense's version of events as presented through the trial." *Id.* Finally, and most importantly, Gonzalez suffered no prejudice from the one identified instance of mistranslation. *See United States v. Huang, supra* note 16, 960 F.2d at 1136 ("the ultimate question is whether the translator's performance has rendered the trial fundamentally unfair"). The chronology of the stop, search, and arrest was not in issue at trial. In addition, the court took immediate steps to remedy the interpreter's apparent error. *See United States v. Urena, supra,* 27 F.3d at 1493 (by stopping the proceedings to ensure that an inaccurate translation was fully corrected, "the trial court clearly was sensitive to potential translation problems"). As we said in *Redman:*

> Although the government presented no formalized evidence of the interpreter's competence, such as language degrees or certifications, *the fact that the interpreter continued in that role ... suggests that the translation must have been competent enough to allow communications between the parties.*

616 A.2d at 337–338 (quoting *United States v. Nazemian,* 948 F.2d 522, 528 (9th Cir.1991), *cert. denied,* 506 U.S. 835, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992) (emphasis added in *Redman* )).

Thus, on the record before us, there is no indication of translator incompetence[18] which would justify a holding that the trial court abused its discretion or committed an error of constitutional magnitude. *See United States v. Urena, supra,* 27 F.3d at 1493. "Indeed, reversal of a conviction such as this one, notwithstanding the absence of prejudice, on grounds so unrelated to the issue of guilt or innocence, would tend to undermine public confidence in the judiciary." *Redman, supra,* 616 A.2d at 338 (citations omitted). We hold, therefore, that although the trial court erred by failing to assure the compe-

17. For clarity, we note that the trial court's discretion to determine the competence of the interpreter refers only to the factual questions of whether an interpreter is needed and whether the appointed interpreter meets the statutory requirements. "[A] trial court does not have discretion to decide whether a defendant who needs

an interpreter has a legal entitlement to one." *State v. Gonzalez–Gongora, supra* note 15, 673 S.W.2d at 818 (citation omitted).

18. We note that appellate counsel has not pointed out any other alleged mistranslation at trial.

tence of the interpreter at the beginning of the trial, *see Kim Long Ko, supra,* note 14, 694 A.2d at 88, this error had little or no effect on the trial and was therefore harmless beyond a reasonable doubt.

## III

For the first time on appeal, Gonzalez contends that Detective Culver impermissibly testified outside the scope of his expertise by offering an opinion on cross-examination regarding the chain of custody of the monetary evidence. According to Gonzalez, the trial court committed plain error when it allowed the jury to hear this "highly prejudicial" testimony. This claim is without merit because the only error cited by Gonzalez is one of his own making, and it surely does not rise to the level of substantial prejudice which is required to show plain error. *See Watts v. United States, supra.*

Detective Culver was qualified as an expert on methods of drug distribution and on police procedures used for handling and safeguarding narcotics evidence. This court has repeatedly upheld the admission of testimony from such an expert. *See, e.g., Griggs v. United States,* 611 A.2d 526, 527 (D.C.1992); *Ford v. United States,* 533 A.2d 617, 626 (D.C.1987) (en banc); *Hinnant v. United States,* 520 A.2d 292, 293 (D.C.1987); *Harris v. United States,* 489 A.2d 464, 470–471 (D.C. 1985). Nevertheless, Gonzalez claims that Culver was inappropriately allowed to testify about the chain of custody of the money that was seized and to opine that the proper chain of custody was followed in this case.

"The decision to admit expert testimony is within the broad discretion of the trial court, and a ruling either admitting or excluding such evidence will not be disturbed unless manifestly erroneous." *Gant v. United States,* 518 A.2d 103, 109 (D.C.1986) (citations and internal quotation marks omitted). As we explained in *Gant:*

[T]his court must determine, from the record on appeal, whether the trial court failed to exercise its discretion with reference to all the necessary criteria in admitting or excluding expert testimony....

"Otherwise the very reason for such deference—*i.e.,* the trial court's opportunity to

observe, hear and otherwise evaluate the witness—will be compromised."

*Id.* at 110 (citations and footnote omitted). The "necessary criteria" to which *Gant* refers include "evaluating the competence of the proffered expert witness ... *assuring that the witness' testimony does not exceed the scope of the expert's qualifications approved by the court,* [and] ... prevent[ing] an expert witness from preempting the function of the jury." *Id.* (emphasis added); *see also United States v. Alonso,* 48 F.3d 1536, 1540, 1541 (9th Cir.1995).

The testimony that Gonzalez characterizes as being "highly prejudicial" was elicited not by the prosecutor but by defense counsel during his cross-examination of the expert witness. Thus the error that occurred, if any, was invited by defense counsel. *See Brown v. United States,* 627 A.2d 499, 508 (D.C.1993) ("defendant may not take one position at trial and a contradictory position on appeal" (citing cases)); *Laney v. United States,* 54 App. D.C. 56, 60, 294 F. 412, 416 (1923) ("Counsel cannot well complain of being prejudiced by a situation which they created"). Moreover, even if this testimony did exceed permissible bounds, it clearly did not result in prejudice to Gonzalez, let alone substantial prejudice. The expert merely testified that the proper chain of custody and handling procedures appeared to have been followed in this case. Since Gonzalez did not deny that the pre-recorded funds were recovered from his person, he could not have been prejudiced by Culver's endorsement of the procedures used in handling this uncontested evidence. Gonzalez has not demonstrated any abuse of discretion, and we find none.

## IV

Gonzalez finally contends that a photograph taken of him shortly after his arrest should not have been admitted into evidence. Because he admitted that he was the person arrested, Gonzalez maintains that his identity was never in dispute and, therefore, that the photograph was cumulative, irrelevant, and unduly prejudicial. This argument is meritless because Gonzalez has failed to show any

prejudice that may have resulted from the photograph's admission. We can discern no prejudice whatever.

When the government introduced the photograph at trial, defense counsel did not initially object. A few moments later, however, defense counsel approached the bench and objected because he had a notion there was a "mug shot rule" that barred the photograph's admission. After consulting his trial manual, counsel apparently withdrew his objection. Nevertheless, when the court reconvened after a recess, the judge said that although he had previously admitted the photograph without objection, he was "currently admitting it over objection." The court agreed with defense counsel that the mug shot rule was inapplicable because the evidence in question was an arrest photograph, not a mug shot. The purpose of the mug shot rule, the court explained, is to prevent undue prejudice by suggesting that a criminal defendant has a prior criminal record; [19] this photograph, however, conveyed no such suggestion because it was "incident to the arrest *in this case*" (emphasis added).

It is well settled that a decision to admit or exclude photographs as demonstrative evidence is within the trial court's sound discretion. *Clark v. United States,* 639 A.2d

76, 81 (D.C.1993); *Russell v. United States,* 586 A.2d 695, 700 (D.C.1991); *Brown v. United States,* 464 A.2d 120, 123 (D.C.1983). The record plainly shows that the trial court weighed the probative value of the arrest photograph against any prejudicial effect before admitting it into evidence. It appears to us that the probative value of the arrest photograph was minimal, since it had little or no relevance to the identification issue that the jury had to resolve.[20] On the other hand, since "[n]othing in the photograph contained information to suggest to the jury that [appellant] had a prior arrest record," *People v. Richards,* 220 A.D.2d 268, 269, 632 N.Y.S.2d 540, 542 (1995), there is no plausible basis for a claim of prejudice. For these reasons we hold that the trial court did not abuse its discretion in admitting the arrest photograph into evidence.

Appellant's conviction is therefore

*Affirmed.*

---

**19.** For a discussion of the mug shot rule, *see, e.g., Williams v. United States,* 481 A.2d 1303, 1305–1306 (D.C.1984).

**20.** There was no dispute that Gonzalez was the person arrested, *i.e.,* the person depicted in the arrest photograph. The issue before the jury, however, was whether Gonzalez was the person who sold drugs, through an intermediary, to Officer Timlick. Gonzalez did not deny that he was arrested or even that he was involved in an attempted drug transaction with a third person (Carlos); his defense was simply that he was a prospective buyer, not a seller. The photograph was of no help to the jury in deciding whether to accept or reject that defense.