Kevin **PORTER**, Appellant,

v.

**UNITED STATES, Appellee.**

No. 97–CF–1795.

District of Columbia Court of Appeals.

Argued Sept. 7, 2000.
Decided March 15, 2001.

Joseph R. Conte, Washington, DC, appointed by the court, for appellant.

Jonathan M. Malis, Assistant United States Attorney, with whom Wilma A.

Lewis, United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Amy Conway, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and WASHINGTON, Associate Judges, and GALLAGHER, Senior Judge.

WASHINGTON, Associate Judge:

After a jury trial, Kevin Porter was found guilty of carnal knowledge in violation of D.C.Code § 22–2801 (repealed).[1] Porter filed a timely notice of appeal to this court arguing that 1) the indictment against him was not timely filed by the government within the six-year statute of limitations period for rape and carnal knowledge; 2) the trial court abused its discretion by denying his request for funds to consult with a possible expert witness; and 3) the trial court abused its discretion by refusing to declare a mistrial because an expert witness for the government testified outside of the boundaries of the trial court's pre-trial order. We affirm.

## I.

On February 28, 1990, an indictment was returned against Porter, charging him with rape and carnal knowledge. Prior to trial, the government moved to admit DNA evidence obtained from Porter, the victim ("L.F."), and the scene of the crime. The trial court denied the government's motion, and the government filed an interlocutory appeal to this court. This court vacated the trial court's order and remanded the case to the trial court for further proceedings in *United States v. Porter*, 618 A.2d 629 (D.C.1992) (*Porter I* ). The case was scheduled for trial on January 17, 1996, after extensive pre-trial hearings and several continued trial dates. On the day of trial, the government was not ready primarily because the assigned prosecutor had been promoted to a supervisory position and was unavailable to try the case on that date.[2] The trial court dismissed the case without prejudice for want of prosecution.

On August 7, 1996, the grand jury returned a new indictment against Porter, charging him with the same offenses (rape and carnal knowledge). On January 14, 1997, the trial court declared a mistrial when the jury was unable to reach a unanimous verdict on either count. On August 12, 1997, a second jury found appellant guilty of carnal knowledge, but the jury was unable to reach a unanimous verdict on the rape charge. The trial court declared a mistrial on that count, and the government dismissed the charge.

### The Government's Evidence

L.F., the younger sister of Porter's then-girlfriend, Marietta Foust Jimmerson, testified that on April 6, 1989 Porter raped her. She was fourteen years old at the time. In April 1989, L.F., her mother, and older sisters lived at 1331 Ives Place, S.E., and Porter frequently stayed at the home. L.F. and her mother shared the master bedroom, Porter and Ms. Jimmerson shared the second bedroom, and a second sister stayed in the basement. Before April 6, 1989, L .F. never felt threatened by Porter and looked up to him as an older brother. However, L.F. had never been alone in the home with Porter before this date.

---

1. Porter was also indicted for rape in violation of D.C.Code § 22–2801 (repealed), but the jury was unable to reach a unanimous verdict on this charge, a mistrial was declared by the trial court, and the government dismissed the charge.

2. The government had moved for a continuance earlier on this basis, but the trial court denied the motion.

On April 6, 1989, after Ms. Jimmerson left for work that morning, L.F. and Porter were home alone. L.F. went into the bathroom to wash before leaving for school. L.F. was wearing only her underclothes after washing, and before returning to her room she looked to see if Porter was in the hallway because she did not want him to see her in her underclothes. L.F. did not see Porter in the hallway, and she ran from the bathroom to her bedroom. She closed the bedroom door and began looking for socks to wear. L.F. did not see anyone in her bedroom, but she noticed that the closet door was slightly open. She did not pay any attention to the closet door, until Porter suddenly jumped out of the closet. Porter banged his hand on the door and scared her. L.F. told Porter to get out because she was not wearing any clothes. Porter then closed the bedroom door. L.F. moved from the bed and began to cover herself up because she felt uncomfortable. She again told Porter to leave, but he did not. She then tried to push Porter out of the bedroom. Porter told L.F. that he was not playing, that he was not going to get out, and that he "wanted to see how big [L.F.] was."

Porter came toward L.F. and they started to wrestle before he pushed her onto the bed. L.F. continued to struggle with Porter while on the bed and she tried to push him off of her. Porter then tried to pull L.F.'s underpants down while she held them up. While Porter continued to remove her underpants, L.F. said to him, "[O]kay, okay, okay, just wait a minute, I'm tired, wait a minute. . . . [L]et me up for a second, let me catch my breath for a second." She then asked Porter why he was acting this way, and he replied, "I want to see how big you are. . . . [Y]ou might as well let me get it over with." L.F. inquired from Porter, "[Y]ou have my sister, why [aren't you] having sex with my sister?" Porter told L.F. that Ms. Jimmerson would not have sex with him.

Although L.F. continued to refuse Porter, he raped her. After the rape, L.F. left the house and went to school. While at an assembly at school, L.F. began crying and told her friend Tosha, that her sister's boyfriend raped her. L.F. left the assembly with another friend, Rhonda Thomas, and L.F. also told Ms. Thomas that Porter raped her. L.F. was scared and wanted to talk with her god-brother, Wendel Jackson, with whom she "felt safe . . . and comfortable." L.F. called her older sister, Ms. Jimmerson, and asked her for Mr. Jackson's telephone number. L.F. was "very distraught" and crying, and Ms. Jimmerson was concerned that she was not in school. L.F. explained to Ms. Jimmerson that she was not in school because some girls tried to beat her up, although this was not true. Ms. Jimmerson told L.F. that she would tell Porter to meet her. L.F. told Ms. Jimmerson she did not want to meet with Porter, and again asked for Mr. Jackson's telephone number.

L.F. spent the rest of the day with Ms. Thomas walking around downtown and telling her about what happened. L.F. was scared to go home and was afraid to call her mother. She arrived home around 10:30 p.m. or 11:00 p.m., and was really upset and crying. L.F. told one of her sisters what had happened. Thereafter, her family confronted Porter, who denied the allegations and said that he and L.F. had been fighting over ice cream.

In April 1989, Ms. Jimmerson and Porter were having problems with their relationship, and had not had sex for about a week before the rape. They never had sex in the master bedroom where L.F. was raped. Ms. Jimmerson testified that the underpants L.F. was wearing on April 6, 1989, were not her underpants, and that

she and L.F. never shared underpants. Also, when showed the fitted sheet from the bed where L.F. identified that she had been raped, Ms. Jimmerson testified that the fitted sheet was never on the bed in the room that she and Porter shared.

Detective Antonio Bruton of the Metropolitan Police Department's Sex Offense Branch responded to L.F.'s home around 11:15 p.m. on April 6, 1989. Detective Bruton described L.F. as "visibly upset." Officer John Allen, a mobile crime scene technician, at the Metropolitan Police Department, arrived around midnight to collect evidence. Shortly after midnight on April 7, 1989, Detective Bruton took L.F. to D.C. General Hospital, where she was examined and tests were run. The sex kit prepared for L.F., as well as her underpants and the fitted sheet, were sent to the Federal Bureau of Investigation ("FBI") laboratory for analysis. Porter provided samples of his blood, saliva, and pubic hair in June of 1989 and April of 1990 for analysis at the FBI laboratory. Ms. Jimmerson also provided a blood sample that was sent to the FBI laboratory.

Dr. Harold Deadman testified as an expert on DNA analysis. Dr. Deadman testified that he had examined the bed sheet, L.F.'s underpants, and the blood samples taken from Porter, L.F., and Ms. Jimmerson. The examination also revealed semen stains on the bed sheet. He testified the male fraction of the stain contained DNA material that matched Porter's blood samples. The female fraction of the stain contained DNA material that matched the DNA material taken from L.F.'s blood samples. Finally, the female fraction of the stain on the fitted sheet did not match Ms. Jimmerson's blood sample.

The semen stain found in the crotch area of L.F.'s underpants contained DNA material in the male fraction that matched Porter's blood samples. The female frac-

tion of the stain could not be definitively linked to either Ms. Jimmerson or L.F. because of a significant amount of bacterial growth. Dr. Deadman concluded that the probability of a coincidental match was approximately one in 469,000, or one in 58,000, using two accepted procedures for determining a DNA match.

*The Defense Evidence*

Porter testified and called one character witness on his behalf. Porter stated that he was currently a night supervisor in the Prince George's County school system. Porter said that on April 6, 1989, he lived with L.F., Ms. Jimmerson, their mother, and sister. He testified that his relationship with Ms. Jimmerson was "kind of shaky." Porter testified that on the morning of April 6, 1989, he went downstairs to get some breakfast food, but there was no food. He noticed two Italian ice cups on the table, and he asked L.F. if she had eaten the Italian ice. L.F. said that she had eaten the ice, and she and Porter argued before he went upstairs and got back in bed. Porter denied that he raped L.F. He testified that a few days earlier L.F. had asked him to buy her some tennis shoes, and he refused. He also testified that the stained underpants belonged to Ms. Jimmerson.

On cross-examination, Porter said he did not go to work on April 6, 1989, and that he went downstairs to the kitchen after Ms. Jimmerson left for work. Porter acknowledged that he and Ms. Jimmerson were not having sex regularly at the time of the rape. He also conceded that the fitted sheet on which L.F. said she was raped would not have fit on the bed that he and Ms. Jimmerson shared. Porter testified on redirect examination that he and Ms. Jimmerson had sex on the fitted sheet on an unspecified occasion.

Phillip Boyd testified he worked with Porter in the Prince George's County

school system. In his opinion, Porter was a truthful and honest person. He also testified on cross-examination Porter never told him about the charges in this case, and he first learned of the charges when he was asked to be a character witness.

## III.

### A. Statute of Limitations

■ On September 10, 1996, Porter moved to dismiss the second indictment and argued that the six-year statute of limitations period governing the offenses had expired. We apply a *de novo* standard of review to issues of statutory interpretation. *See District of Columbia v. Jerry M.*, 717 A.2d 866, 868 (D.C.1998).

■ Porter argues that the plain meaning of D.C.Code § 23–113(a)(2) (1996 Repl.) provides that if an indictment is not pending six years after the date of the offense, the statute of limitations expires. Porter concedes that if an indictment is. filed before the six-year limitations period, then a defendant may be prosecuted after the elapsing of six years. Porter argues, however, that the statute of limitations is not tolled during the time that an indictment is pending. Thus, if a defendant is indicted originally one year after the crime and that indictment is pending for five years before being dismissed, the statute of limitations would not have been tolled during those five years, and the government is precluded from bringing charges against the defendant after dismissal. The government argues that the statute of limitations does not run during the pendency of an indictment. Thus, if the indictment was filed one year after the offense and there was a period of five years between the dismissal of the original indictment and the filing of a new indictment, then the government has more than four years remaining in limitations period.

D.C.Code § 23–113 provides in pertinent that:

(a) *Time Limitations.—*

(2) [A] prosecution for a felony other than murder in first or second degree is barred if not commenced within six (6) years after it is committed.

(b) *Time when offense committed.—*An offense is committed ... when every element occurs.... Time starts to run on the day after the offense is committed....

(c) *Commencement of prosecution.—*A prosecution is commenced when:

(1) an indictment is entered....

(d) *Suspension of period of limitation.—*The period of limitation for an offense, and any necessarily included offense, does not run during any time when a prosecution against the defendant for that offense is pending in the courts of the District of Columbia.

■ The words used in a statute " 'should be construed according to their ordinary sense, and with the meaning commonly attributed to them.' " *Demus v. United States*, 710 A.2d 858, 861 (D.C. 1998) (citation omitted). Here, it is clear that the plain language of the statute refutes Porter's claim that the statute of limitations is not tolled while an indictment is pending in court. *See* D.C.Code § 23–113(d). The statute explicitly provides that a prosecution is commenced when an indictment is entered, *see* D.C.Code § 23–113(c), and that "[t]he period of limitations for an offense ... does not run during any time when a prosecution against the defendant ... is pending...." D.C.Code § 23–113(d). In this case, Porter was charged with an offense that occurred on April 6, 1989. Thus, the statute of limitations began to run the day after, on April 7, 1989, pursuant to

D.C.Code § 23–113(b). The prosecution against Porter began when he was originally indicted for the offense on February 12, 1990, less than a year after the offense, and well within the six-year statute of limitations period under D.C.Code § 23–113(a)(2). The original indictment was dismissed for want of prosecution on January 17, 1996, almost six years after the original filing. However, during the period of time from February 12, 1990, until January 17, 1996, while the case was pending in the trial court and on interlocutory appeal to this court, the six-year limitations period was suspended under D.C.Code § 23–113(d). After the original indictment was dismissed, the limitations period began to run again from January 17, 1996, until the new indictment was filed on August 7, 1996. This period of time that the limitations period actually ran amounted to less than seven months. The seven months added to the time that had elapsed before the original indictment was filed (less than a year), amounts to less than two years, of the six in which the government had to prosecute Porter.

■ Porter's central argument that the word "run," when used in D.C .Code § 23–113(d), denotes that the statute of limitations does not expire when a prosecution is pending is without merit. This very issue, as to whether the "running" of a statute of limitations should be interpreted to mean the passing of time or the expiration of the limitations period, was resolved by the United States Court of Appeals for the District of Columbia Circuit in *Hunter–Boykin v.. George Washington Univ.*, 328 U.S.App.D.C. 22, 29, 132 F.3d 77, 84 (1998). Indeed, in *Hunter–Boykin,* the court found that the common usage of the word "run," when used in reference to a statute of limitations, means the passing of time and not the expiration of the limitations period. *See id.* (rejecting argument

that the " 'running of the statute of limitations' means that the time has 'passed' or 'expired,' and is not just 'passing' "). Moreover, the fact that subsection 23–113(d) is plainly titled *"Suspension* of period of limitation," supports our interpretation of the statute. (emphasis added).

It is also worth noting that the word "run" is used in subsection (b) of the same statute, and the "the normal rule of statutory construction is that identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (citations and internal quotation marks omitted); *Edwards v. United States,* 583 A.2d 661, 664 (D.C.1990) (same). D.C.Code § 23–113(b) provides in relevant part that "time starts to run on the day after the offense is committed[.]" Clearly, subsection 23–113(b) provides that the passage of time of the statute of limitations begins the day after the offense was committed. Surely, it is inconsistent that the word "run" means the passing of time when used in subsection 23–113(b), but refers to the expiration of the limitations period when used in subsection 23–113(d). Instead, when subsections 23–113(b) and 23–113(d) are harmonized, they provide that for the purpose of the statute of limitations, the time period starts to run on the day after the offense is committed, but does not run and is suspended during the pendency of a prosecution for that offense.

■ Porter also suggests that to interpret the word "run" to mean the passing of time would make subsection 23–113(e) of the statute a nullity. Subsection 23–113(e) provides:

> If a timely complaint, indictment, or information is dismissed for any error, defect, insufficiency, or irregularity, a new prosecution may be commenced within three (3) months after the dis-

missal becomes final even though the period of limitation has expired at the time of the dismissal or will expire within three (3) months thereafter.

Here, Porter asserts that if subsection 23–113(d) is read to suspend the limitations period during a prosecution, then subsection 23–113(e) is superfluous because in no case will the limitations period have "expired at the time of [the] dismissal" of an indictment. Instead, Porter argues that the limitations period will go on indefinitely and the government will always have time to file a new indictment, thus, the three-month extension provided for defective indictments in subsection 23–113(e) would be of no significance. To the contrary, we conclude that subsection 23–113(d) is totally consistent with subsection 23–113(e). D.C.Code § 23–113(e) simply provides that after the dismissal of a defective indictment, the government has a minimum of three months to bring a new indictment. In a case where an insufficient indictment may be dismissed with less than three months remaining before the expiration of the limitations period, subsection 23–113(e) guarantees the government at least three months to file a new indictment, notwithstanding the fact that the statute of limitations is due to expire earlier.

■ Furthermore, although it is unnecessary to look to the legislative intent of a statute where the plain meaning is clear, *see Burgess v. United States*, 681 A.2d 1090, 1094 (D.C.1996), the legislative history of the statute clearly supports our interpretation that the limitations period is tolled during the pendency of a prosecution. The Council of the District of Columbia specifically explained that

D.C.Code § 23 113(d) "merely provides that the time during which a prosecution for the same conduct is pending against the accused does not count against the period of limitations." *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 4–121, THE DISTRICT OF COLUMBIA CRIMINAL STATUTE OF LIMITATIONS ACT of 1982, at 9 (January 13, 1982).

The government also offers that the tolling provision set forth in D.C.Code § 23–113(d) is supported by reference to the Model Penal Code § 1.06(b), which this jurisdiction's code provision closely tracks. Section 1.06(b) of the Model Penal Code provides in pertinent part that: "The period of limitations does not run . . . . (b) during any time when a prosecution against the accused for the same conduct is pending in this state." ALI, MODEL PENAL CODE AND COMMENTARIES, Part 1, § 1.06 (1985). The Commentary to the Model Penal Code also clearly states that section 1.06 is a "[t]olling provision" that specifies a situation "in which time is not counted as part of the period of limitation[.]" *Id.* at 98.

■ It is true that upon dismissal of a case, federal courts do not suspend or toll the time during which the original indictment was pending under the general federal statute of limitations, 18 U.S.C. § 3282 (1994). *See United States v. Midgley*, 142 F.3d 174, 177 (3d Cir.1998) (holding that "for purposes of [18 U.S.C.] § 3282, counts of an indictment do not survive a dismissal"); *see also United States v. Peloquin*, 810 F.2d 911, 913 (9th Cir.1987).[3] In *Peloquin*, the court made clear that the general federal statute of limitations was not tolled during the pen-

---

**3.** In the case of the dismissal of "defective" or "insufficient" indictments, the government is allowed to file a new indictment within six months of dismissal under the federal savings

clause, even after the applicable statute of limitations has expired. *See* 18 U.S.C. § 3288 (2000).

dency of a prosecution because "Congress chose not to do so, on occasion, to make explicit the suspension of limitations periods, yet chose not to do so" with respect to 18 U.S.C. § 3282. *810 F.2d* at 913. In the instant case, however, we are presented with a different statutory scheme than 18 U.S.C. § 3282, and the clear intent of the Council of the District of Columbia to suspend the limitations period during the pendency of a prosecution.[4]

Thus, it is clear from the plain language of the statute, its legislative history, and by reference to a similar provision in the Model Penal Code, that the limitations period in this case was tolled during the time that a prosecution was pending against Porter. Therefore, the second indictment against Porter was timely filed, and the limitations period did not expire as he suggests.

## B. Denial of Porter's Request to Retain an Expert Witness

Porter filed a pre-trial motion for the approval of funds to retain John E. Smialek, M.D., as a clinical forensic expert pursuant to D.C.Code § 11–2605(a) (1995 Repl.), for the purpose of testifying as a defense expert witness at trial. Porter proffered to the trial court that Dr. Smialek would be able to testify that normally semen would be found in the vaginal vault of a woman who was raped. The trial court denied Porter's motion without prejudice because it questioned whether Dr. Smialek, the Chief Medical Examiner

for the state of Maryland, was qualified to testify about the expectation of finding semen in the vaginal vault of a living female rape victim. The trial court's concern stemmed from the fact that Dr. Smialek's primary expertise, as the Chief Medical Examiner for the state of Maryland, was the examination of homicide victims. The trial court felt that only a doctor familiar with treating living rape victims would be qualified to testify as an expert, and that Porter failed to demonstrate that Dr. Smialek was so qualified. Porter submitted a motion for reconsideration, where he highlighted certain portions of Dr. Smialek's curriculum vitae in an effort to convince the trial court that Dr. Smialek practiced as a clinical forensic expert, and thus was qualified to testify in the case because his experience was not restricted to the examination of deceased persons. The trial court denied Porter's second motion, also without prejudice, notwithstanding Dr. Smialek's extensive credentials and varied experience, and determined that without more or better information about Dr. Smialek's experience in this area, he was not qualified to render an expert opinion regarding the semen remains in a living rape victim. The trial court instructed Porter to find another doctor with the appropriate credentials, or to submit something more to the court with respect to Dr. Smialek to demonstrate that he would be qualified to testify on the subject. Porter did not

4. In *Midgley,* the court articulated that the statute of limitations " 'exists primarily to protect the rights of the defendant,' " and " 'his defense to the original charges may [be] jeopardized by the passage of time.' " 142 F.3d at 178. The *Midgley* court also pronounced that "any statute of limitations incorporates an 'irrebuttable presumption' that, beyond the period of limitation, 'a defendant's right to a fair trial would be prejudiced.' " *Id.* at 177. It is important to note that although the expiration of the limitations period during the time a prosecution is pending does not pose a statute of limitations problem for the government upon dismissal of a case under D.C.Code § 23–113(d), the passage of time may very well constitute a violation of a defendant's constitutional right to a speedy trial, and a defendant has the right to make such a challenge. *See* U.S. CONST. amend. VI; Super.Ct.Crim.R. 48(b).

submit any further information with respect to Dr. Smialek's qualifications after the trial court's request. On the day before trial, Porter renewed his request for funds to consult with Dr. Smialek, and the trial court denied his request because nothing more was submitted by Porter to demonstrate that Dr. Smialek would be qualified to testify as an expert on the specific subject matter.

 D.C.Code § 11–2605(a) [5] entitles a defendant to the services of an expert, if the accused is financially unable to obtain the services and the " 'services are necessary to an adequate defense.' " *Gaither v. United States*, 391 A.2d 1364, 1367 (D.C. 1978) (citation omitted). The decision to authorize defense counsel to obtain an expert, however, "is entrusted to the sound discretion of the trial court." *Id.* at 1369. Therefore, the trial court's determination that Dr. Smialek would not qualify as an expert witness, and its decision to deny the funds based on this reason, is not easily overturned.

The question in this case is whether the trial court erred in denying the funds because it did not believe that Dr. Smialek qualified as an expert to testify about semen remains in a living rape victim. Porter argues that that Dr. Smialek's curriculum vitae clearly delineates his extensive research and expertise in the general area of clinical forensic medicine, and not only the examination of deceased persons. The government argues that the trial court exercised permissible discretion by denying Porter's request for funds for Dr. Smialek because Porter simply failed to provide the trial court with evidence of Dr. Smialek's

qualifications on the specific subject matter of which he would be asked to testify. The government submits that if the trial court was skeptical as to whether Dr. Smialek was qualified to testify, then his services would not be considered "necessary" under D.C.Code § 11–2605, a finding required for the trial court to authorize the payment of funds. The government also asserts that the trial court permissibly exercised its discretion because it denied Porter's original motion without prejudice, allowing Porter the opportunity to address the trial court's concerns about Dr. Smialek's qualifications or time to procure the services of another doctor qualified to testify about the presence of semen in the vaginal vault of living rape victims. Finally, the government posits that any error by the trial court in denying Porter's request for funds was harmless. The government contends that even had the trial court authorized funds for Porter to retain Dr. Smialek to give expert testimony, the trial court would not have allowed Dr. Smialek to testify without further credentials; therefore, any error in not authorizing the funds was harmless. *See Gaither,* 391 A.2d at 1369 n. 8 (commenting that trial court's error in denying request for an expert may be harmless); *Gonzalez v. United States,* 697 A.2d 819, 826 (D.C. 1997) (the trial court's decision to admit or exclude expert testimony will not be disturbed unless "manifestly erroneous"). In addition, the government argues that any error was harmless because Dr. Smialek's inexperience in examining living rape victims would have significantly undermined the impact of his testimony at trial, and

5. D.C.Code § 11–2605(a) provides:
 Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court shall authorize counsel to obtain the services.

the government's evidence in this case was very strong.

In this case, Porter failed to proffer sufficient information to address the trial court's reasonable concern that Dr. Smialek was not qualified to offer expert testimony on the presence of semen in the vaginal vault of living rape victims. Dr. Smialek's curriculum vitae listed fourteen publications, abstracts, and lectureships dealing generally with clinical forensic medicine. Nothing in Dr. Smialek's curriculum vitae, however, confirmed his ability to testify regarding semen remains in living rape victims. One abstract and presentation listed on Dr. Smialek's curriculum vitae is entitled, "Detection of Sperm and Quantitative Prostatic Acid Phosphates Determination in 43 Female Homicide Victims." However, this research focused on the detection of sperm in homicide rape victims, and was not enough to satisfy the trial court's demand that in order to qualify as an expert witness in this case, it had to be shown that Dr. Smialek was able to testify with regard to living rape victims. Therefore, on the record before us, we cannot say that the trial court abused its discretion by denying Porter's request for funds to consult with Dr. Smialek.

Finally, we agree with the government that any error by the trial court in denying Porter funds to consult with Dr. Smialek was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). First, given the trial court's concern about Dr. Smialek's qualifications to testify, without further information, the trial court would have reserved the right to disallow his testimony at trial. *See Gonzalez*, 697 A.2d at 826. Most importantly, however, the evidence against Porter was powerful. Here, the victim, L.F. recounted the details of her rape by Porter to the jury. In addition, the scientific evidence presented by the government that the DNA found in the male fraction of the semen on the bed sheets and in L.F.'s underpants matched Porter's blood samples fully corroborated L.F.'s testimony.

## C. Refusal to Grant a Mistrial

In a pre-trial order, following this court's decision in *Porter I*, the trial court ruled that the government could introduce DNA evidence of the match between Porter's blood samples and the DNA evidence found on the fitted sheet and L.F.'s underwear that were evaluated in the FBI laboratory. The trial court ordered that DNA evidence consistent with the National Research Council ("NRC") report could be admitted. The trial court also ruled that the NRC methodology would yield two different probabilities of a coincidental match in this case using two generally accepted DNA matching procedures, one in 469,000, or one in 58,000.

Porter objected to the government expert, Dr. Deadman's, scope of testimony. At trial, Dr. Deadman testified that the probability of a coincidental match between Porter's blood samples and the DNA material found in the semen stains on the sheet and L.F.'s underpants were approximately one in 58,000, or one in 469,000, using a less conservative procedure. In response to the government's question whether the less conservative procedure was less accurate, Dr. Deadman responded that "both numbers are accurate in the sense that they're not underestimating at all the frequency of Kevin Porter's DNA profiles. They are, in my opinion, overestimates, his DNA profile is more uncommon than either of these num-

bers." [6] Porter argues Dr. Deadman's testimony exceeded the scope set by the trial court's pre-trial order, and suggested that the possibility he committed the crime was greater than the actual probabilities presented.

The government argues that Dr. Deadman did not testify outside of the parameters of the trial court's order. The trial court determined that the order did not limit Dr. Deadman's testimony to only the two fixed numbers, but rather that his testimony had to be based on the methodology accepted by the NRC. After the trial court's voir dire of Dr. Deadman, it concluded that his testimony that the statistical probability could be lower, was consistent with the methodology in the NRC report. A pertinent portion of the trial court's voir dire of Dr. Deadman was as follows:

> THE COURT: But in saying that the statistical probability could be, I guess in your terminology lower than the statistics that you give, is that in compliance with the recommendation that was made by the NRC?

> [DR. DEADMAN] Yes, I think everyone realized, or essentially everyone realized that the NRC recommendation was an overly conservative estimate, and it was designed to make sure that when there was a dispute about the frequency in a particular case, that the number that was used would not [be] bias[ed] against the defendant.

Dr. Deadman also testified that "the general science community recognized these recommendations as … an estimate that was higher than the true frequency or the true probability," and that a member of the original committee that produced the NRC Report, as well as a subsequent NRC committee, had commented that the methodology used in the original report was "over[ly] conservative."

 The decision "to declare a mistrial is within the sound discretion of the trial court, and its decision in that regard will not be disturbed except 'in extreme situations threatening a miscarriage of justice.'" *Goins v. United States,* 617 A.2d 956, 958 (D.C.1992). A mistrial may be granted, if prejudicial circumstances arise. *See Smith v. United States,* 665 A.2d 962, 966 (D.C.1995). "The burden of showing prejudice to support a motion for a mistrial is upon the movant[.]" *Hallman v. United States,* 410 A.2d 215, 217 (D.C. 1979).

It is true that the pre-trial order ultimately reached the decision that the two numbers, one in 58,000, or one in 469,000, were found to be generally accepted in the scientific community by the NRC and could be introduced at trial. The extensive pre-trial order also generally supports the approval of scientific information consistent with the NRC report. In addition, the order does not explicitly say that the testimony of the expert was limited only to the introduction of the two exact numbers.

---

**6.** Porter contends Dr. Deadman also testified that a new scientific procedure was currently being used, which was employed subsequent to the trial court's pre-trial order. He further contends that a hearing should have been held on the new methodology testified to by Dr. Deadman. In addition, Porter argues that the government never provided him with Dr. Deadman's new opinions with respect to the new methodology as required by Super.Ct.Civ.R. 16(a)(1)(E). Because the new methodology was not disclosed to Porter, he argues that he had no notice of the new evidence Dr. Deadman testified about, and consequently was unable to rebut this new information. However, the record reflects that Dr. Deadman did not testify in front of the jury about the new procedure. Instead, this testimony was taken outside of the presence of the jury by the trial court and cannot be said to have prejudiced Porter's case.

Indeed, the pre-trial order approved of the introduction of these specific probabilities, as opposed to the introduction of any other numbers that may have been reached by different scientific methods. Although we understand Porter's argument that the testimony that the numbers were underestimates suggests that some other numbers may exist that would link Porter more strongly to the crime, no other numbers were presented to the jury that were specifically disallowed by the pre-trial order. It does not appear that the pre-trial order was designed to preclude commentary on the nature of the methods used to reach the two particular probabilities, as long as Dr. Deadman's commentary was accurate and accepted by the NRC. Had Dr. Deadman given testimony suggesting that the use of other methodologies would yield a greater probability that Porter committed the crime, then the introduction of this scientific information, that had no basis on the NRC report, would be contrary to the pre-trial order. Here, the trial court ascertained that Dr. Deadman's testimony was consistent with the science approved of by the NRC, and thus, determined that Dr. Deadman's testimony was not outside of the scope set by the pre-trial order. Because the record provides some support for the trial court's ruling that Dr. Deadman's testimony was consistent with the approved methodology in the NRC report, we are constrained to say that the trial court did not abuse its discretion in determining that his testimony did not exceed the boundaries of the pre-trial order.

■ In any event, even assuming that the testimony was outside of the scope of the order, a mistrial based solely on this ground was not warranted. We have previously summarized the great strength of the government's evidence in this case. Thus, we cannot conclude on this record that Dr. Deadman's comment that the

numbers were conservative figures constituted a miscarriage of justice.

Accordingly, the judgment of the Superior Court is affirmed.

*So ordered.*

